UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| INTERNATIONAL UNION, UNITED AUTOMOBILE AEROSPACE AND AGRICULTURAL WORKERS OF AMERICA, UAW, and its LOCAL 1402, | Case No.: 1:11-cv-28 |
| and | Hon. Robert J. Jonker<br>United States District Judge |
| RONALD CLAPP, ROBERT RIETVELD, ANN SKILES, and JOHN CHESTER, as individuals, on behalf of themselves and all persons similarly situated, | |
| Plaintiffs,<br>v. | |
| HYDRO AUTOMOTIVE STRUCTURES, INC., HYDRO AUTOMOTIVE STRUCTURES NORTH AMERICA, INC., and HYDRO ALUMINUM ADRIAN, INC. | |
| Defendants. | |

# EXHIBIT 16

**TO PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

AGREEMENT

BY AND BETWEEN



**HYDRO AUTOMOTIVE STRUCTURES**

Holland, Michigan

AND



The International Union,
United Automobile, Aerospace and
Agricultural Implement Workers of
America, UAW
and Local Number 1402

**Effective January 24, 2003**

## ARTICLE XIV - PENSION PLAN

**SECTION 1. GENERAL.** Although reflected in a separate document, the pension plan which was in effect during the life of the contract that expired on September 2, 1986, will continue as part of this labor agreement and will continue in effect during the new contract's life at Company expense. In addition, the improvements described in subsequent sections of this Article will be placed into effect on the dates indicated, at Company expense, and will be reflected in the pension plan's text.

**SECTION 2. FUTURE RETIREES.** The basic benefit level per month per year of credited service for otherwise eligible employees who retire under the pension plan's normal, early, disability, or vested deferred provisions will be $12.25 per month per year of credited service on and after October 1, 1988, $15.25 on and after December 3, 1996, $16.25 on and after December 4, 1999, $17.25 on and after December 4, 2000 and $18.25 on and after December 4, 2001 and $19.50 on and after January 24, 2005. Applicable actuarial reduction formulas specified within the pension plan will continue in effect. The benefit level per month per year of credited service in effect at the time a vested employee's service terminates will continue to be the basis for determining the monthly benefit amount when he is eligible to receive such benefits.

**SECTION 3. PAST RETIREES AND SURVIVING SPOUSES.** On and after October 1, 1978, the pension benefit of former employees, and surviving spouses of former employees, who retired under the normal, early, vested deferred, or disability features of the pension plan prior to October 1, 1978, will be increased fifty cents ($.50) per month per year of credited service.

On and after October 1, 1978, the pension benefit of former employees, and surviving spouses of former employees, who retired under the normal, early, vested, deferred, or disability features of the pension plan prior to October 1, 1978, will be increased by fifty cents ($.50) per month per year of credited service in effect at the time a vested employee's service terminates will continue to be the basis for determining the monthly benefit amount when he is eligible to receive such benefits.

**SECTION 4. OTHER PENSION PLAN CHANGES.**
A. MILITARY CREDITED SERVICE. Pursuant to the Selective Service Act, an employee who left or leaves the Company's employ and who returned or returns to the Company's employ will be credited with pension plan credited service lost while serving in the military of the United states government; however, in no case will the reinstatement of such credits serve to afford more pension plan credited service than such employee would have earned as a full-time employee of the Company during the time he served in the military.

B. EARLY RETIREMENT AGE. An otherwise eligible employee may continue to retire at age fifty-five (55); however, the pension plan's early retirement reduction

## ARTICLE XV - INSURANCE

**SECTION 1. GENERAL.** Except as otherwise provided by and changed in this Agreement, life, accidental death and dismemberment, transition and bridge, weekly indemnity, and medical insurance coverage's (i.e., hospitalization and surgical) for inactive payroll employees which were in effect during the life of the contract that expired on September 2, 1986, will continue in effect during the new agreement's life. Policies regarding eligibility for coverage and coverage effective dates which prevailed during the life of the contract that expired September 2, 1986, and which are unchanged by this Article, will continue in effect during this labor agreement's life.

B.  **WEEKLY SICK AND ACCIDENT BENEFITS AND DISPUTED WORKMEN'S COMPENSATION CLAIMS.** Weekly sickness and accident benefits will be payable to a Workmen's Compensation claimant whose disabling circumstances commence on and after October 1, 1978, as hereafter provided. Subject to the completion of a reimbursement agreement form provided by the Company, disability advances shall be paid to a claimant for weekly sickness and accident benefits who has alleged that the disabling circumstance is work-related when the Company does not voluntarily accept liability under existing Workmen's compensation laws, providing medical evidence of total and continuous disability satisfactory to the insurance carrier is submitted. Such payments will cease should the Company's insurance carrier subsequently determine that a claimant is not eligible for weekly sickness and accident benefits.

In the event it is subsequently determined that weekly sickness and accident benefits remitted in this circumstance should not have been paid and/or should have been paid in a lesser amount, written notice shall be given to the claimant, and he shall repay the entire amount or the amount of overpayment to the insurance carrier. If the claimant fails to repay promptly, the insurance carrier shall recover the amount due and owing by making an appropriate deduction or deductions from any future benefit payment or payments payable to the employee under the group insurance program, or may cause the Company to make the appropriate deductions from future compensation payable by the Company to the claimant.

## SECTION 6. MEDICAL INSURANCE.

A.  **CMM 100/200, 80-20 PLAN.** During the term of this Agreement, eligible employees and their dependents will be covered by the Michigan Blue Cross/Blue Shield CMM 100/200, 80-20 plan (or equivalent alternate carrier coverage), with a $1000 stop loss (after deductibles are met).

B.  **PRE - 11/08/90 RETIREE MEDICAL INSURANCE COVERAGE**
    Those employees who retire prior to November 8, 1990, will for the term of this Agreement be covered pursuant to the medical coverage reflected by this Agreement. This includes:
    1.  **B-77 Program.** Effective November 9, 1993, eligible past retirees (and their dependents) who have retired from active service under the Pension Plan will be covered by the Michigan Blue Cross/Blue Shield B-77 Program (or equivalent alternate carrier coverage), including the FAE-VST-Reciprocity Rider. The cost of such retiree group coverage shall be equally borne by the Company and the retiree electing the coverage.
    2.  **Master Medical Program.** Effective November 9, 1993, eligible past retirees (and their dependents) who have retired from active service under the Pension Plan will be covered by the Michigan Blue Cross/Blue Shield 80/20 co-pay master medical program (or equivalent alternate carrier coverage). Deductibles under this plan shall be one hundred dollars ($100.00) individuals and two hundred dollars ($200.00) family. The cost

of such retiree group coverage shall be equally borne by the Company and the retiree electing the coverage.

3. **Drug Coverage.** Effective November 9, 1993, coverage for past retirees only under the previous contract's medical insurance program's two dollar ($2.00) co-pay drug rider under the pension plan, will continue in force and to be fully paid by the Company.

4. **Medicare Co-Payment.** During the life of this Agreement the Company will continue to contribute eight dollars and twenty cents ($8.20) per month toward the cost of Medicare coverage for eligible past retirees and surviving spouses.

5. **Premium Co-Payment.** Retiree group premium co-payments must be paid on a monthly basis and may be made by cash payment or by authorized reduction in the retiree's monthly retirement benefits.

C. **POST NOVEMBER 8, 1990, RETIREE MEDICAL INSURANCE COVERAGE**

Those employees who retire subsequent to November 8, 1990, will for the term of this Agreement be covered pursuant to the medical coverage reflected by this Agreement. This includes:

1. **CMM 80-20 Plan with $100/$200 Deductible.**

   Effective November 9, 1993, employees retiring from active service (and their dependents) will be covered by the Michigan Blue Cross/Blue Shield CMM 80/20 - $100/$200 Deductible Plan (or equivalent alternate carrier coverage), with a $1,000 stop loss (after deductibles are met).

   Blue Cross/Blue Shield (or alternate carrier) to reimburse eligible covered retirees for reasonable and customary charges (R & C) pursuant to Blue Cross/Blue Shield's (or alternate's) schedule of reimbursable payments.

   The cost of such retiree group coverage shall be equally borne by the Company and the retiree electing the coverage.

2. **Medicare Co-Payment.** During the life of this Agreement the Company will continue to contribute eight dollars and twenty cents ($8.20) per month toward the cost of Medicare coverage for eligible retirees and surviving spouses.

3. **Premium Co-Payment.** Retiree group premium co-payments must be paid on a monthly basis and may be made by cash payment or by authorized reduction in the retiree's monthly retirement benefits.

D. **POST DECEMBER 3, 1997, RETIREE MEDICAL INSURANCE COVERAGE**

Those employees who retire subsequent to December 3, 1997, will for the term of this Agreement be covered pursuant to the medical coverage reflected by this Agreement. This includes:

1. **CMM 80-20 Plan with $100/$200 Deductible.**

   Effective December 3, 1997, employees retiring from active service (and their dependents) will be covered by the Michigan Blue Cross/Blue Shield

CMM 80/20 - $100/$200 Deductible Plan (or equivalent alternate carrier coverage), with a $1,000 stop loss (after deductibles are met).

The cost of such retiree group coverage shall be equally borne by the Company and the retiree electing the coverage.

2. **Medicare Co-Payment.** During the life of this Agreement the Company will continue to contribute eight dollars and twenty cents ($8.20) per month toward the cost of Medicare coverage for eligible retirees and surviving spouses.

3. **Premium Co-Payment.** Retiree group premium co-payments must be paid on a monthly basis and may be made by cash payment or by authorized reduction in the retiree's monthly retirement benefits.

**SECTION 7. DENTAL INSURANCE COVERAGE.** Effective on and after September 3, 1978, eligible employees and their covered dependents will continue to be provided dental program insurance coverage at Company expense. Coverage effective dates will be as per this Article's Section 8.

**SECTION 8. INSURANCE COVERAGE EFFECTIVE DATES.**

A. Group insurance coverage (i.e., life, AD&D, dependent life, transition and bridge, weekly sickness and accident) and medical insurance coverage's for a new hire or a rehired employee will become effective on the thirty first (31st) day of employment, providing such employee is on the active payroll on such day.

B. For an employee reinstated from the inactive to the active payroll, group and medical insurance coverage's provided by this agreement will become effective on the effective date of placement onto the active payroll.

C. Except for Company-paid group and medical insurance coverage's hereinbefore specified for employees who retire under this agreement's pension plan, all Company-paid group and medical insurance coverage's will cease on the first day immediately following termination of seniority.

D. Company-paid group and medical insurance coverage's for inactive payroll employees will be continued in accordance with the following:
  1. Life, dependent life, AD&D, transition and bridge, and medical insurance coverage's will be afforded to employees who become inactive by reason of layoff, vacation leave, personal leave, or any other approved leave for four (4) calendar months following the month in which such leaves commence.
  2. Life, dependent life, AD&D, transition and bridge, and medical insurance coverage's will be afforded to employees who become inactive by reason of an approved non-industrial injury and/or sickness, or maternity leave for six (6) calendar months immediately following the month in which such approved leaves commence.

E. An employee who becomes inactive by reason of layoff and/or an approved leave may purchase medical insurance coverage for eighteen (18) months immediately following the last month for which the Company remits insurance premiums in

behalf of the inactive employee by making advance payments to the Company's personnel office.

F.  An employee who becomes inactive by reason of an industrial injury and/or illness shall continue to be provided with coverage's for life, dependent life, AD&D, transition and bridge, and medical insurance for a period not to exceed one (1) year. Cost of such coverage's will be fully paid by the Company.

**SECTION 9. INSURANCE HIGHLIGHT BOOKLETS.** Descriptions of benefits and eligibility requirements which prevailed during the immediately preceding labor agreement's term and improvements to which reference is herein made will be reflected in insurance highlight booklets which the Company will require the respective carriers to provide covered employees.

**SECTION 10. EYEGLASS PURCHASE.** Effective September 3, 1983, the Company will make available to dependents of employees (those eligible for hospital/medical insurance coverage) the option to purchase eyeglasses through the Company on the same basis as such program has previously been available to employees.

**SECTION 11. CASH-IN-LIEU OF INSURANCE.** Effective January 1, 2000 the Company will pay employees who do not elect coverage under the group medical plan $150.00 per month (subject to legally required deductions) provided that they submit proof of other coverage for themselves and their dependents. If/when employees lose their other coverage they shall be eligible to rejoin the Company's group plan effective the date their loss began. Employees who simply change their mind will have to wait until the open enrollment period.

**ARTICLE XVI - GENERAL**

**SECTION 1. BULLETIN BOARDS.** The Company shall permit the use by the Union a sufficient space on the Company's bulletin board for the posting of notices restricted as follows:
A.  Notice of Union recreational and social affairs.
B.  Notice of Union elections, appointments, and results of Union elections pertaining to the plant or department involved.
C.  Notice of Union meetings.
All such notices must be submitted to the Company for approval before posting.

**SECTION 2. SAFETY.** The Company shall continue to make reasonable provisions for the safety and health of its employees during the hours of their employment, as it has prior to the signing of this Agreement through the maintenance of its protective devices and equipment in accordance with the requirements of the state law.

In order to carry out the extent of this section, there shall be a joint Union-Management plant safety team consisting of three representatives from the union and three representatives from management. The union shall designate its representatives. The

## ARTICLE XIX - TERMINATION AND MODIFICATION

This Agreement will become effective on January 24, 2003, as ratified on January 24, 2003 and shall continue in full force and effect without change until 11:59 January 23, 2006, and thereafter for a successive period of sixty (60) days, unless either party shall, on or before the sixtieth (60th) day prior to expiration, serve written notice on the other party of a desire to terminate, modify, alter, renegotiate, change, or amend this Agreement. A notice of desire to modify, alter, amend, renegotiate, or change, or any combination thereof, shall have the effect of terminating the entire Agreement (on the expiration date) in the same manner as a notice of desire to terminate, unless before that date all subjects of amendments proposed by either party have been disposed of by agreement or by withdrawal by the party proposing the amendment.

Within ten (10) days after receipt of any such notice, a conference will be arranged to negotiate the proposals, in which case this Agreement shall continue in full force and effect until termination, as provided herein.

Notices shall be sufficient if sent by mail, addressed, if to the Union, to Local Number 1402, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW, Holland Michigan, or to such address as the Union shall furnish to the Company in writing; and, if to the Company, to Hydro Automotive Structures, 533 Ottawa Avenue, Holland, Michigan, or to such other address as the Company may furnish to the Union in writing.

**IN WITNESS WHEREOF**, the Company has caused these presents to be signed in its behalf by its duly authorized and accredited representatives; and the Union has caused the same to be signed in its name by its duly authorized and accredited representatives, officers and committeepersons this 24th day of January, 2003.

Hydro Automotive Structures

International Union,
United Automobile, Aerospace
and Agricultural Implement
Workers of America, UAW,
and Local Number 1402, UAW

_____
Age Larsstuen
President

_____
Jerry Zachary
President, Local 1402

_____
Allison Solis
Human Resources Manager

_____
Daril Valentine
Chairman, Bargaining Committee

_____
Kevin Pogodzinski
Business Area Manager

_____
Phil Sullivan
Committee Person

_____
Elena Sgroia
Finance Manager

_____
Richard DeNio
Committee Person

_____
Mike Bolles
Committee Person

_____
Steve Ayres
International Representative

_____
Don Oetman
Regional Director