# EXHIBIT 9
# (Part 2)

## 1986-1989  UAW - BOHN CONTRACT

<u>Benefits</u>                          <u>Benefit Amounts</u>

Weekly sickness and accident
benefits for employees
(Commencing the first day of an
accident and the fourth day of
a sickness for a maximum period
of twenty six (26) weeks; six-
(6) week maternity benefit)          $140/week

Medical insurance (employee and
dependents):

   Michigan Blue Cross/Blue
   Shield MV-2 ward program,
   including the following
   riders:  D45NM, ML, IMB,
   OPC, CC, DCCR, $2.00 co-pay
   drug XF for retirees, FAE,
   VST, reciprocity

SECTION 2.  LIFE INSURANCE.  Effective
October 1, 1978, the insurance coverage for
otherwise eligible active payroll employees will
be increased from eleven thousand dollars
($11,000) to twelve thousand dollars ($12,000).
Effective October 1, 1979, life insurance coverage
for otherwise eligible active payroll employees
will be increased from twelve thousand dollars
($12,000) to thirteen thousand dollars ($13,000).

SECTION 3.  ACCIDENTAL DEATH AND DISMEMBERMENT
INSURANCE.  Effective October 1, 1978, accidental
death and dismemberment insurance for otherwise
eligible active payroll employees will be
increased from nine thousand dollars ($9,000) to
eleven thousand dollars ($11,000).

SECTION 4. TRANSITION AND BRIDGE BENEFITS.

A. TRANSITION BENEFITS ELIGIBILITY. The
   transition benefit monthly payment will
   commence on the first day of the month
   following your death. This payment will
   continue for twenty four (24) months or until
   you are not survived by anyone who qualifies
   as an eligible survivor, whichever occurs
   first.

   The transition benefit will be paid in order
   of priority to:

   1. Your widow or widower, if she or he was
      lawfully married to you for at least one
      (1) year immediately prior to your death.

   2. Your unmarried child or children under
      twenty one (21) years of age at the time
      each monthly benefit becomes payable.

   3. Your parent or parents for whom you
      provided at least fifty percent (50%)
      support during the calendar year preceding
      the year in which your death occurred or
      you became continuously disabled until
      death.

   (Since more than one individual may qualify
   under 2 and 3 above, the monthly benefit will
   be divided equally among the survivors.)

B. BRIDGE BENEFIT ELIGIBILITY. The bridge
   benefit is payable to your widow or widower in
   the form of monthly income benefits and will
   begin on the first day of the month following
   receipt of the last transition benefit

payment. Your spouse must have been at least
forty eight (48) but under sixty (60) years of
age at the time of your death, and not
remarried at the time this benefit commences.
Also, if your spouse receives Social Security
benefits for your dependent children, the
bridge benefit will not become payable until
the Social Security benefits cease.

The bridge benefit will terminate when your
spouse:

1.  Remarries.

2.  Attains age sixty two (62) or any younger
    age at which full widow or widower's
    insurance benefits are payable under the
    Federal Social Security Act.

3.  Ceases to qualify as an eligible survivor.

4.  Dies.

D.  TRANSITION AND BRIDGE DISABILITY BENEFIT.
    In case of total disability while insured,
    your survivor income benefit insurance will be
    continued without further cost for as long as
    you remain totally disabled, if:

    1.  The disability starts before your sixtieth
        (60th) birthday, and, in all probability,
        you will be unable to engage in any work
        for an extended period of time, and

    2.  At the time you become so disabled, you
        have an eligible survivor.

78

Article XV Continued

SECTION 5.  WEEKLY SICKNESS AND ACCIDENT
BENEFITS.

A.  WEEKLY BENEFIT LEVEL IMPROVEMENTS.  For new
    claims originating on and after October 1,
    1986, the weekly benefit level will be
    increased from one hundred ten dollars
    ($110.00) to one hundred forty dollars
    ($140.00).

B.  WEEKLY SICK AND ACCIDENT BENEFITS AND
    DISPUTED WORKMEN'S COMPENSATION CLAIMS.
    Weekly sickness and accident benefits will be
    payable to a Workmen's Compensation claimant
    whose disabling circumstances commence on and
    after October 1, 1978, as hereafter provided.
    Subject to the completion of a reimbursement
    agreement form provided by the Company,
    disability advances shall be paid to a
    claimant for weekly sickness and accident
    benefits who has alleged that the disabling
    circumstance is work-related when the Company
    does not voluntarily accept liability under
    existing Workmen's Compensation laws,
    providing medical evidence of total and
    continuous disability satisfactory to the
    insurance carrier is submitted.  Such payments
    will cease should the Company's insurance
    carrier subsequently determine that a claimant
    is not eligible for weekly sickness and
    accident benefits.

    In the event it is subsequently determined
    that weekly sickness and accident benefits
    remitted in this circumstance should not have
    been paid and/or should have been paid in a
    lesser amount, written notice shall be given
    to the claimant, and he shall repay the entire

amount or the amount of overpayment to the
insurance carrier. If the claimant fails to
repay promptly, the insurance carrier shall
recover the amount due and owing by making an
appropriate deduction or deductions from any
future benefit payment or payments payable to
the employee under the group insurance
program, or may cause the Company to make the
appropriate deductions from future compen-
sation payable by the Company to the claimant.

C. WEEKLY SICK AND ACCIDENT DURING MATERNITY
LEAVE. The Company agrees to indemnify Local
Number 1402 and the International Union
against possible liability in a suit seeking
to require the inclusion of maternity benefits
in sickness and accident insurance coverage to
a greater extent than the current program
provides. The Company agrees to comply with
final litigation in this regard.

SECTION 6. MEDICAL INSURANCE.

A. B-77 PROGRAM. Effective October 1, 1978,
eligible employees and their dependents will
be covered by the Michigan Blue Cross/Blue
Shield B-77 Program, including the FAE-VST-
Reciprocity rider. The cost of such coverage
is to be borne by the Company.

B. RETIREE DRUG COVERAGE. Effective on and
after October 1, 1978, coverage under the
currently in-effect medical insurance
program's two dollar ($2.00) co-pay drug rider
for retirees under the pension plan, which is
part of this agreement, will continue to be
fully paid by the Company.

C. MASTER MEDICAL PROGRAM. Effective
   October 1, 1978, eligible employees and their
   dependents will be covered by the Michigan
   Blue Cross/Blue Shield 80/20 co-pay master
   medical program. Deductibles under this plan
   shall be one hundred dollars ($100.00) indi-
   vidual and two hundred dollars ($200.00)
   family. The cost of such coverages is to be
   borne by the Company.

SECTION 7. DENTAL INSURANCE COVERAGE.
Effective on and after September 3, 1978, eligible
employees and their covered dependents will
continue to be provided dental program insurance
coverage at Company expense. Coverage effective
dates will be as per this Article's Section 8.

SECTION 8. INSURANCE COVERAGE EFFECTIVE DATES.

A. Group insurance coverage (i.e., life, AD&D,
   dependent life, transition and bridge, weekly
   sickness and accident) and medical insurance
   coverages for a new hire or a rehired employee
   will become effective on the thirty first
   (31st) day of employment, providing such
   employee is on the active payroll on such day.

B. For an employee reinstated from the inactive
   to the active payroll, group and medical
   insurance coverages provided by this agreement
   will become effective on the effective date of
   placement onto the active payroll.

C. Except for Company-paid group and medical
   insurance coverages hereinbefore specified for
   employees who retire under this agreement's
   pension plan, all Company-paid group and
   medical insurance coverages will cease on the

81

first day immediately following termination of seniority.

D. Company-paid group and medical insurance coverages for inactive payroll employees will be continued in accordance with the following:

    1. Life, dependent life, AD&D, transition and bridge, and medical insurance coverages will be afforded to employees who become inactive by reason of layoff, vacation leave, personal leave, or any other approved leave for two (2) calendar months following the month in which such leaves commence.

    2. Life, dependent life, AD&D, transition and bridge, and medical insurance coverages will be afforded to employees who become inactive by reason of an approved sickness, industrial injury and/or sickness, or maternity leave for six (6) calendar months immediately following the month in which such approved leaves commence.

E. An employee who becomes inactive by reason of layoff and/or an approved leave may purchase medical insurance coverage for one (1) year immediately following the last month for which the Company remits insurance premiums in behalf of the inactive employee by making advance payments to the Company's personnel office.

F. An employee who becomes inactive by reason of an industrial illness shall continue to be provided with coverages for life, dependent life, AD&D, transition and bridge, and medical

insurance for a period not to exceed two (2) years. Cost of such coverages will be fully paid by the Company.

SECTION 9. INSURANCE HIGHLIGHT BOOKLETS. Descriptions of benefits and eligibility requirements which prevailed during the immediately preceding labor agreement's term and improvements to which reference is herein made will be reflected in insurance highlight booklets which the Company will request the respective carriers to provide covered employees.

SECTION 10. EYEGLASS PURCHASE. Effective September 3, 1983, the Company will make available to dependents of employees (those eligible for hospital/medical insurance coverage) the option to purchase eyeglasses through the Company on the same basis as such program has previously been available to employees.

## ARTICLE XVI — GENERAL

SECTION 1. BULLETIN BOARDS. The Company shall permit the use by the Union of sufficient space on the Company's bulletin board for the posting of notices restricted as follows:

A. Notice of Union recreational and social affairs.

B. Notice of Union elections, appointments, and results of Union elections pertaining to the plant or department involved.

C. Notice of Union meetings.

83

Article XVI Continued

All such notices must be submitted to the Company for approval before posting.

SECTION 2. SAFETY. The Company shall continue to make reasonable provisions for the safety and health of its employees during the hours of their employment, as it has prior to the signing of this agreement through the maintenance of its protective devices and equipment in accordance with the requirements of the state law.

In order to carry out the intent of this section, the Union shall appoint two (2) of its members who are employed at Plant 16 and one (1) of its members who is employed at Plant 19 to serve on the Safety Committee. The Safety Committee shall meet at least once each month. Special meetings may be held when conditions warrant. Unsafe conditions shall be reported first to the supervisor of the area.

SECTION 3. CONTRACT PREEMPTION. Any agreement made by representatives of either party which is not consistent with the terms of this contract shall be of no force and effect.

SECTION 4. VALIDITY OF AGREEMENT. This agreement supersedes all prior agreements and understandings, oral or written, except as they are expressly reaffirmed or incorporated herein. Should any term or terms of this agreement be or become wholly or partly in conflict with the laws existing during the term of this agreement, the validity of the balance of this agreement shall in no way be affected, and this agreement shall be deemed modified to conform to the provisions of said existing laws.

84

Article XVI Continued

SECTION 5. COMPLETE AGREEMENT. The parties
acknowledge that during the negotiations which
resulted in this agreement, each had the unlimited
right and opportunity to make demands and
proposals with respect to any subject or matter
not removed by law from the area of collective
bargaining, and that the understandings and
agreements arrived at by the parties after the
exercise of that right and opportunity are set
forth in this agreement. Therefore, the Company
and the Union, for the life of this agreement,
each voluntarily and unqualifiedly waives the
right, and each agrees that the other shall not be
obligated, to bargain collectively with respect to
any subject or matter referred to or covered in
this agreement or with respect to any subject or
matter not specifically referred to or covered in
this agreement, even though such subject or matter
may not have been within the knowledge or contem-
plation of either or both of the parties at the
time that they negotiated or signed this agree-
ment.

SECTION 6. TRUSTEE REPORTS. Copies of all
trustees' reports of all benefit plans shall be
provided to the International Union, UAW,
Solidarity House, Detroit, Michigan (8000 East
Jefferson Avenue), and to the Regional Director,
1-D, Box H, Grand Rapids, Michigan 49501.

SECTION 7. MAILING LISTS. Within thirty (30)
days after the ratification of this agreement and
every six (6) months thereafter during the term of
this agreement, the Company shall give to the
International Union the names of all retirees, as
well as employees covered by this agreement,
together with their addresses and Social Security
numbers as they appear on the records of the

85

Article XVI Continued

Company.  The International Union shall receive
and retain such information in confidence and
shall disclose it only to those officials of the
Union whose duties require them to have such
information.

SECTION 8.  COMPENSABLE INJURIES.  When, because
of a compensable injury, it is necessary for an
employee to leave his work for medical treatment
on the day of injury, he shall be paid for time
lost from regular work while receiving treatment.
If the doctor finds that the employee is unable to
return to work on the day of injury, the employee
shall be paid for the balance of the shift on
which he was injured.  If, upon his return to
work, the employee has to receive medical treat-
ment due to such injury, and such treatment can
only be received during his regular work shift, he
shall be paid for time lost while receiving
treatment.

SECTION 9.  PRINTING OF CONTRACT.  The Company
shall have the total agreement printed in booklet
form and furnish sufficient copies to the Union
and to each employee in the bargaining unit.

SECTION 10.  CHANGES OF ADDRESS.  It shall be
the responsibility of employees to report any
change of address or telephone numbers to the
Company in writing.  The employees shall get a
receipt of such notice from the employment office
with a duplicate furnished to the Union.

SECTION 11.  CREDIT UNION PAYROLL DEDUCTION.
The credit union payroll deduction program which
was in effect under the prior labor contract will
continue during the life of this agreement.

Article XVI Continued

SECTION 12. MEMORANDUMS OF UNDERSTANDING.
During negotiations, which resulted in this labor
agreement, the Union and the Company agreed that
the following memorandums of understanding will
prevail during this contract's term.

A. GROUP LEADERS. A group leader is an hourly
   payroll employee who is a member of the bar-
   gaining unit. He is normally paid a certain
   amount of money above the rate of highest rated
   worker in the group that he is the leader of.
   He works at regularly assigned production work,
   and, in addition, acts as a leader of his
   group. He may provide personal relief time for
   the members of the group. A group leader
   punches the time clock in the same manner as
   any other employee, and he receives overtime
   pay for all overtime hours worked.

   The group leader is not a supervisor. He
   receives his orders and work schedules from a
   supervisor and then acts as a conduit to pass
   the supervisor's order on to the work crew. He
   carries out set instructions of the supervisor.

   The group leader will assign work within the
   group in accordance with the supervisor's
   instructions and the work schedule of jobs or
   parts to be produced.

   The group leader will give necessary instruc-
   tions to employees in performance of their work
   to insure an even flow of production in the
   department.

   In case of failure on the part of an employee
   to do a job properly, he shall explain how the

87

job should be done and why it should be done
that way.  A group leader is not to report
rule violations to the supervisor for the
purpose of causing Management to impose disci-
pline on an employee or group of employees.
It will be expected that violations affecting
the safety of other employees or the worker
involved will be referred to the steward and
supervision.

He does not attend supervisory meetings and
does not have the privileges reserved for
supervisors.

Supervisors are not to perform production
work; however, the group leader devotes a
substantial part of his work hours performing
the same type of work that his group performs.

The group leader makes routine reports to his
supervisor concerning the flow of work and
conditions encountered by the group, but he
has no authority to hire, transfer, suspend,
lay off, recall, promote, discharge, reward,
or discipline other employees, or to adjust
their grievances, or to effectively recommend
such action.

On shifts where a supervisor is not available
and a situation requiring some immediate
action or decision outside the authority of a
group leader occurs, the group leader present
shall contact the supervisor or designated
Company representative to determine the action
to be followed.

B.  OVERTIME DISTRIBUTION.  Overtime will not be
offered to an employee in accordance with the

contract's Article 11, if this would require
the employee to work sixteen (16) hours in
succession, except on a voluntary basis.  In
all other situations, the labor agreement's
Article 11 will be adhered to when overtime
work opportunities are distributed.

C.  INSPECTION DEPARTMENT SENIORITY ADMINIS-
TRATION.  Seniority within the Inspection
Department will continue to be administered as
follows:

1.  The Inspection Department at each of the
two (2) plants (16 and 19) will operate
plantwide within each plant.  Job classifi-
cations within the Inspection Department
at each plant will be Group Leader and
Floor Inspector.

2.  For the purpose of training Floor
Inspectors to become competent in the
inspection of more than one (1) product,
Floor Inspectors will be assigned to
departments other than their home depart-
ment.  When they have gained competence in
the inspection of other product(s), they
will be allowed to transfer back to their
home department and be assigned to other
departments only to maintain their compe-
tence or as work schedules dictate.

3.  Job openings for floor inspectors will be
posted plantwide.

D.  SAFETY INSPECTIONS AND MEETINGS.  The
Union's designated representative will accom-
pany federal or state safety inspectors on
tours of the plant, and will be paid for

regular work time missed as a consequence of
such inspections.

In addition, the Union Committee's chairman
may participate in monthly Union-Management
safety meetings and will be paid for regular
work time missed as a consequence of such
meetings. Participation in monthly Union-
Management safety meetings by the Union
Committee's chairman will be in addition to
participation by the three (3) members of the
Safety Committee to which specific reference
is made in Section 2 of this contract's
Article XVI.

E. UNION ACCOMMODATIONS. The Company will
provide a standup desk and a file cabinet
which may be locked, for use by the Union
Committee in the conduct of Union business at
Plant 19.

The Company will further provide at Plant 16 a
Union office for use by the Union Committee,
stewards, Union president, and Union vice
president. The design and location of such
office shall be determined by the Company.
Use of the Union office shall be exclusively
for the conduct of Union business. Access to
the Union office shall be limited to those
Union officials referenced above.

F. VENDING MACHINE PROCEEDS. Periodically,
financial statements reflecting ending machine
sales and commissions, if any, will be made
available to the Union's financial secretary.
Although the Company is willing to consider
Union suggestions for disposition of vending
machine sales commissions, if any, first

Article XVI Continued

priority to such funds will be to underwrite expenses of the annual ham and/or turkey program for all employees of the Holland facilities. Each employee may indicate a preference to receive either a ham or turkey no later than December 1, each year. If no preference is expressed by an employee, the Company shall determine whether a ham or turkey is given that employee.

G. ANNUAL INVENTORY. Employees to conduct the annual physical inventory will be chosen from plantwide seniority list. The most-senior employees will be asked to accept such assignments within their plant; however, should the number of volunteers be insufficient, the least-senior employees on the plantwide seniority list will be obliged to accept inventory work assignments.

In the event annual physical inventory work is completed prior to the end of the normal work week and production work is not resumed until the following normal work week, inventory workers will be assigned available work which they can do without regard to traditionally accepted lines of demarcation between the job classifications.

If the annual physical inventory is conducted on Saturday or Sunday, it will be done by utilizing the plantwide overtime volunteer list, in accordance with the provisions of Article XI, Section 1, on overtime.

Employees participating in the annual physical inventory shall be paid fifty cents ($.50) per

91

hour above the established hourly pay rate for the Production Helper classification for the time so employed.

H. SICKNESS AND ACCIDENTS PAYMENTS. This is to confirm that the Company has contacted its insurance carrier of record of sickness and accident insurance and has confirmed that application forms shall be telecommunicated to them for processing payment, and, when received, the insurance company shall make payment within three (3) days of receipt.

I. SUPERVISORS PERFORMING BARGAINING UNIT WORK. Over the course of the next twelve (12) months, the Management of the Company shall make every effort to eliminate the ongoing practice of some of its first-level supervisors to perform bargaining unit work. Should Management be unsuccessful in these efforts, it shall adjust the supervisory work force to insure such practices are discontinued.

J. ONE-DAY VACATION. At the discretion of Management, vacation periods of one (1) day may be granted if requested prior to the day being sought. Approval of the request for vacation time off shall not be unreasonably withheld.

K. EDUCATIONAL IMPROVEMENT. The Company agrees to reimburse any employee the tuition, or course fee cost, for certain short courses and/or adult education courses successfully completed by the employee, provided the course selected is related to the plant's work

activities and is approved by the Company and
the Union.

L.  EXTRUSION DIE SHOP.

   1.  Classification:  Extrusion Die Maker.

   2.  Two (2) of the first three (3) employees
      placed in the EDM Department must be from
      within.

   3.  If the first of those three (3) is a
      person hired from the street, that person
      must be fully qualified for this position.
   4.  If this first person placed is from the
      street, there will be no need for a
      working supervisor.

   5.  If the first two (2) placed are drawn from
      within, the Union will accept a working
      training supervisor for a period of two
      (2) years or less.  This supervisor will
      not replace any hourly employee on
      overtime work.

   6.  The Extrusion Die Maker will be handled in
      the Upgrader program as defined in Article
      XVII, Section 11 of the labor agreement.

   7.  The rate progression will be as follows:

| | |
|---|---|
| Start rate | $11.74 |
| After six (6) months | 11.80 |
| After one (1) year | 11.86 |
| After one-and-a-half (1-1/2) years | 11.92 |
| After two (2) years | 11.98 |

8. Training program to be a full and total
   program to include all phases necessary in
   this operation, i.e., programming, etc.

SECTION 13. PAYROLL ERROR ADJUSTMENTS. The
Company shall make payroll error adjustments, for
regular hours worked in a week, within twenty four
(24) hours of notification, if requested. It is
understood that such adjustments shall be made
only in those cases where the Company erred.
Further, it is understood and agreed by the
parties that errors for all overtime worked shall
be corrected when notified and adjusted in the
next payroll processing routine for payment on the
next following payday.

SECTION 14. INSURANCE BOOKLETS. The Company
and the Union will strive jointly for updated
insurance booklets on a regular basis. These
booklets will be printed by the insurance carrier
for each and all specific benefits and shall be
given to all bargaining unit employees as soon as
possible after the completion of each series of
contract negotiations.

SECTION 15. INSURANCE COST NOTIFICATION. The
Company shall annually provide all its bargaining
unit employees, upon notification by the insurance
carrier of record, of any changes in their cost of
continuing medical insurance, life and dependent
life insurance, AD&D insurance, and bridge and
transition coverage in the event of their layoff
from the Company.

ARTICLE XVII - SKILLED TRADES SUPPLEMENT

SECTION 1. SKILLED TRADES DEFINITION. Skilled
Trades Departments, for the purpose of this

94

Article XVII Continued

agreement, shall mean the Tool and Die,
Maintenance, Extrusion Die Repair, Layout
Inspection, Sample Making, and Extrusion Die
Making Departments.

SECTION 2. OCCUPATIONAL SENIORITY. Seniority
in the Skilled Trades Departments shall be by
occupations or trades within a department. The
seniority list shall be by basic classification,
except that present employees of such departments
shall continue to be listed in the same order
shown on seniority lists last published prior to
December 5, 1969. Neither this section nor any
other section of this agreement shall be inter-
preted to mean that the Company shall not have the
right of assigning work outside of classification
to fill out a Journeyman's time or to answer an
emergency.

The Skilled Departments of the two plants shall
remain separate and apart, except that plant
seniority, as herein defined, may, because of a
reduction in work, result in the assignment of
skilled employees from one plant to the Skilled
Departments of the other plant. Furthermore, the
Company reserves the right to temporarily assign
skilled employees of either plant to the Skilled
Departments of the other plant as the need arises,
such assignment to be made with proper regard for
the provisions of the Skilled Trades Agreement.

Journeymen skilled trades employees shall be
permitted to exercise seniority to displace (bump)
a less senior journeyman to achieve an interplant
transfer within the same classification. The
exercise of a bump to accomplish such interplant
transfer shall be limited to a maximum of one (1)
bump in any three (3) month period within a

95

Article XVII Continued

classification from Plant 16 to Plant 19, and
likewise, a maximum of one (1) bump in any three
(3) month period within a classification from Plant
19 to Plant 16. A skilled trades employee who
exercises seniority to move from one plant to
another by transfer or bump, shall not thereafter
be entitled to an interplant transfer or bump
during the following six (6) calendar month period.

SECTION 3. FUTURE OCCUPATIONAL SENIORITY.
After the signing of this agreement, seniority of
Journeymen in the Skilled Trades Departments shall
begin as of date of entry into such department,
except graduates of the apprenticeship program;
they shall have seniority as provided for in the
apprenticeship standards.

SECTION 4. SENIORITY OUTSIDE SKILLED TRADES.
Production workers will not carry seniority into
the skilled trades occupations; however, skilled
trades workers who were formerly employed as
production workers at either Plant 16 or Plant 19,
may, in case of layoff, exercise their plant
seniority as provided in Article IX of the bar-
gaining agreement. Skilled trades workers who
were hired directly into a skilled trades occu-
pation shall not be permitted to exercise plant
seniority to transfer to a production worker
classification, except by mutual agreement of the
Company and the Union.

SECTION 5. JOURNEYMAN DEFINITION. The term
"journeyman," as used in this agreement, shall
mean any person:

A. Who presently holds a Journeyman classifi-
   cation in the plant in the skilled trades
   occupations.

96

Article XVII Continued

B. Who has served a bona fide apprenticeship and has a certificate which substantiates his claim of such service.

C. Who has had eight (8) years of practical experience and can prove same with proper affidavits.

The Company may consider the possession of a UAW Journeyman Card as presumptive proof of qualifications under B and C above.

SECTION 6. FUTURE SKILLED TRADES EMPLOYMENT. Any further employment in the skilled trades occupations in these plants, after signing of this agreement, shall be limited to Journeymen, apprentices, or employees in training on non-apprenticeable job classifications.

SECTION 7. LAYOFF AND RECALL. In the case of layoff in the Skilled Trades Departments, the following procedure shall be used:

A. Temporary employees.

B. Probationary Journeymen.

C. Youngest-seniority employee within the occupation.

D. Youngest-seniority employee in the department, providing the employee retained is able to perform the available work.

E. The same procedure shall apply in the Maintenance Department.

97

F.  Recalls shall be made in the reverse order of
    the layoffs.

SECTION 8.  SKILLED TRADES OCCUPATIONS.  The
following classifications shall be established in
the Skilled Trades Departments:

    Tool and Die Maker
    Maintenance (Electricians and Millwrights)
    Extrusion Die Repair (not apprenticeable)
    Sample Maker (not apprenticeable)
    Layout Inspector (not apprenticeable)
    Extrusion Die Maker (not apprenticeable)

SECTION 9.  APPRENTICESHIP STANDARDS.  The
Company and the Union have negotiated an
apprenticeship program.  The apprenticeship
standards are in keeping with the standards of the
International Union, UAW.  The apprenticeship
standards shall be considered as an inseparable
part of the supplementary agreement.

SECTION 10.  LABOR AGREEMENT APPLICATION.  All
sections of the bargaining agreement presently in
effect, which are not inconsistent with the
supplement, shall apply to the skilled workers.

SECTION 11.

A.  When the Company determines it necessary to
    increase the number of employees in the
    Extrusion Die Repair, Extrusion Die Maker,
    Sample Maker, and Layout Inspector classifi-
    cations, such opening(s) shall be filled in
    the following order of preference:

1. If any qualified Journeymen have previously been reduced out of the classification to be filled, such employee(s) shall be returned to the classification in accord with the recall provisions of the agreement.

2. If no qualified Journeymen are available through the recall procedure, the opening(s) shall be posted for bid by employees of the Company.

B. When an Upgrader Trainee job is to be filled in the Extrusion Die Repair, Extrusion Die Maker, Sample Maker, or Layout Inspector classification, bargaining unit employees from other sections of the plant may be transferred to the appropriate department and reclassified as Upgrader Trainees.

C. Such transferees shall be given on-the-job experience supplemented with applicable and available outside education to permit them to become proficient in performing the duties of the trade in which the individual is being trained.

D. Notice of openings for Upgrader Trainees shall be posted on the plant bulletin boards and Upgraders will be selected by the Company on the basis of their overall qualifications, which shall include but not be limited to applicable skills acquired in prior employment, skills acquired during Wickes Manufacturing Company employment, and applicable training and education acquired through recognized educational institutions.

Article XVII Continued

>When qualifications are relatively equal,
>seniority will prevail.

>E. Should no qualified employee apply for an
>Upgrader Trainee opening, the Company may hire
>a suitable qualified person from outside the
>Company for training under provisions of this
>agreement. New employees shall not be hired
>into these Upgrading Training classifications
>until an opportunity has been provided to all
>qualified employees having adaptable skill and
>ability to transfer into these classifi-
>cations.

>F. Employees who are transferred into or hired
>into the Upgrader Training Program shall serve
>a probationary period of ninety (90) days.
>The probationary period shall not include
>periods of layoff and/or periods where an
>employee is transferred back into a non-
>skilled classification.

>G. Upon completion of the upgrading period, such
>employee shall use his skilled trades senior-
>ity (one hundred percent (100%) of his actual
>training time) for the purpose of layoff and
>recall.

>H. In the event of a curtailment of force in
>skilled trades classification and/or
>classifications, such Upgrader and/or
>Upgraders will be transferred out of the
>affected classification(s), i.e., Extrusion
>Die Repair, Extrusion Die Maker, Sample Maker,
>Layout Inspector, back to their former
>department and classification in accordance
>with seniority provisions of this agreement,
>per Article IX, Section 5. An employee who

occupies Upgrader Training status in one (1) of the four (4) skilled trade job classifications shall not be permitted to exercise his Upgrader Training seniority against an employee occupying Upgrader Training status in one (1) of the other three (3) skilled trade Upgrader job classifications. The Upgraders will exercise seniority in their own Upgrading classification in the event of a reduction of force. The last individual transferred into or hired into an Upgrader classification shall be the first to be transferred out or laid off, as the case may be, i.e., last in, first out.

I.  An employee may withdraw from the Upgrader Training Program at any time and return to his former non-skilled classification and department in accordance with his non-skilled trade seniority. The Company may remove an Upgrader Trainee during his probationary period. The Company may remove an Upgrader Trainee who has completed the probationary period from the program for failure to participate in the educational program or for failure to progress toward Journeyman status on the job.

J.  Employees who withdraw from the Upgrader Training Program, or those employees who are removed from the program per paragraph I above, shall be prohibited from reentering an Upgrader Training Program in the same classification, except by mutual agreement of the Company and the Union.

K.  An Upgrader will not be permitted to exercise shift preference over another Upgrader during the Upgrader Training Program and/or

101

Journeymen cannot exercise shift preference over an Upgrader Trainee. Upgraders shall work those shifts which would be most advantageous to their related training. Upon attainment of Journeyman status, employees are subject to shift transfer based on their skilled trades seniority.

L. The base rate of newly-hired Upgraders, excluding cost-of-living, shall be as follows:

| | |
|---|---|
| 1st three (3) months | 70% of Journeyman rate |
| 2nd three (3) months | 75% of Journeyman rate |
| 3rd three (3) months | 80% of Journeyman rate |
| 4th three (3) months | 80% of Journeyman rate |
| Next six (6) months | 90% of Journeyman rate |
| Next six (6) months | 95% of Journeyman rate |
| After two (2) years | Journeyman rate |

Seniority employees who transfer into the Upgrader Program shall enter the program at a base rate of twenty four cents ($.24) per hour less than the Journeyman rate, and thereafter shall be increased six cents ($.06) per hour each six (6) months until the Journeyman rate is reached. However, employees transferring into the Upgrader Program whose hourly base rate in their former classification is less than twenty four cents ($.24) per hour below the Journeyman rate shall retain their existing base rate until such time as the six (6) month interval of increases permits a rate adjustment. In no case will an employee, upon transfer into the Upgrader Program, maintain a base rate in excess of the Journeyman rate for the Upgrader classification entered.

The Company will reimburse Upgrader Trainees for required tools not furnished by the Company in an amount not to exceed two hundred dollars ($200), as follows:

A maximum of fifty dollars ($50) shall be provided by the Company at the outset of the training period. A maximum of an additional fifty dollars ($50) shall be provided by the Company after successful completion of the probationary period. A maximum of an additional one hundred dollars ($100) shall be provided by the Company after successful completion of the training program. The Company shall be furnished with receipts to verify expenditure of the above monies for required tools.

M. The Upgrader Trainee(s) shall be required to sign a statement consenting to the terms and conditions of this agreement, thereby waiving:

1. The right to any permanent status in the Skilled Trades classification other than Upgrader seniority until successful completion of such training period.

N. It is desirable that Upgraders attain necessary related training to make them competent in as short a period of time as possible.

O. An Upgrader Trainee shall acquire Journeyman status only after two (2) calendar years in the Upgrader classification and following successful completion of all related classroom instruction. Further, upon acquiring Journeyman status, overtime hours will be equalized within his own classification.

103

F.  The Company agrees to pay, on behalf of those
    employees covered by this Upgrader Program,
    for books, registration fees, and/or tuition
    required in connection with related training
    for a period of not more than three (3) years
    under this program.  When an Upgrader Trainee
    is required by the Company to attend classes
    outside of the normal working hours for the
    purpose of facilitating training in Extrusion
    Die Repair, Extrusion Die Maker, CNC Operator
    and Setup, Sample Maker, or Layout Inspector,
    the Company will pay the individual his appli-
    cable rate of pay, including cost-of-living,
    but excluding shift premium and overtime
    premium for the actual hours that an indi-
    vidual participates in classroom instruction.
    This related training as outlined shall be on
    a mandatory basis for all future employees
    entering into this Upgrader Training.  In the
    event an employee fails to achieve a passing
    grade in a course of related training, the
    cost of repeating such course of instruction
    shall be borne by the employee.

G.  The Upgrader Training Program may be amended
    to include additional training programs by
    mutual agreement of the Company and the Union.

### ARTICLE XVIII - WORK RELOCATION

Notwithstanding any other provisions in this agree-
ment to the contrary, the Company reserves the
right to relocate work when such relocation is
determined in its sole judgment to be in the
Company's best interest on the basis of sound busi-
ness practices.  Such actions shall not be taken
in a capricious or arbitrary manner.

## ARTICLE XIX - TERMINATION AND MODIFICATION

This agreement will become effective on
September 21, 1986, and shall continue in full
force and effect without change until 12:00 mid-
night September 8, 1989, and thereafter for a
successive period of sixty (60) days, unless either
party shall, on or before the sixtieth (60th) day
prior to expiration, serve written notice on the
other party of a desire to terminate, modify,
alter, renegotiate, change, or amend this agree-
ment. A notice of desire to modify, alter, amend,
renegotiate, or change, or any combination there-
of, shall have the effect of terminating the
entire agreement (on the expiration date) in the
same manner as a notice of desire to terminate,
unless before that date all subjects of amendments
proposed by either party have been disposed of by
agreement or by withdrawal by the party proposing
the amendment.

Within ten (10) days after receipt of any such
notice, a conference will be arranged to negotiate
the proposals, in which case this agreement shall
continue in full force and effect until termina-
tion, as provided herein.

Notices shall be sufficient if sent by mail,
addressed, if to the Union, to Local Number 1402,
International Union, United Automobile, Aerospace
and Agricultural Implement Workers of America,
UAW, Holland, Michigan, or to such address as the
Union shall furnish to the Company in writing;
and, if to the Company, to Bohn Aluminum and Brass
Division, Plant 16, Wickes Manufacturing Company,
Holland, Michigan, or to such other address as the
Company may furnish to the Union in writing.

Article XIX Continued

IN WITNESS WHEREOF, the Company has caused these
presents to be signed in its behalf by its duly
authorized and accredited representatives; and the
Union has caused the same to be signed in its name
by its duly authorized and accredited representa-
tives, and the Union has caused the same to be
signed in its name by its accredited officers and
committeepersons this

____12____ day of ___*February*___, 1987.

Article XIX Continued

Bohn Aluminum and Brass
Division—Plants 16 & 19
Wickes Manufacturing
Company
Holland, Michigan

International Union,
United Automobile,
Aerospace and Agri-
cultural Implement
Workers of America,
UAW, and Local Number
1402, UAW

_Richard Brooks_
Richard Brooks
VP Manufacturing

_Cheryl Lucas_
Cheryl Lucas

_Donald Wade_
Donald Wade
VP Manufacturing

_Ken Ter Horst_
Ken Ter Horst

_Thomas Fulton_
Thomas Fulton
Plant Manager — 16

_Pierre Jalving_
Pierre Jalving

_Donald Hoyt_
Donald Hoyt
Plant Manager — 19

_Brian Hyma_
Brian Hyma

_Scott Guernsey_
Scott Guernsey
Mgr. Pers./Ind. Rel.

_Darlene Robbins_
Darlene Robbins

_Roger Van Dam_
Roger Van Dam
Plant Supt. — 16

_Robert Rietveld_
Robert Rietveld

_E. R. Eckert_
E. R. Eckert
Director-Ind. Relations

_James Sanborn_
James Sanborn

_Paul Mastos_
Paul Mastos
Regional Director

107

JAIL LETTER

September 3, 1978

Mr. Robert Rietveld
Chairman, Bargaining Committee
Local #1402, U.A.W.
Holland, Michigan

During our 1978 contract negotiations, we
discussed several times emergency leaves of
absence pertaining particularly to employees who
may be confined by the law. The following
expresses our understanding relative to such a
situation:

> It is understood that if an employee is
> incarcerated by the law not to exceed 30
> calendar days, he shall not lose his
> seniority, but beyond this time he shall
> be subject to loss of his seniority. In
> addition, should an employee at any time be
> convicted of a felony, he shall be subject
> to loss of his seniority.

It is our belief that the above states the under-
standing between the two parties.

Sincerely,

J. C. Tucker
Director-Employee Relations
Bohn Group

cc: Robert Hulsebus
    International Representative
    Region 1-D, U.A.W.

BOHN ALUMINUM AND BRASS DIVISION
PLANT 16, HOLLAND, MICHIGAN
March 28, 1974
SHOP RULES

THE FOLLOWING OFFENSES ARE VIOLATIONS OF SHOP
RULES AND ARE GROUNDS FOR DISCIPLINARY ACTION,
INCLUDING DISCHARGE:

1. Leaving job without permission or not
   reporting to the job on time.

2. Producing excessive scrap or inferior work
   through carelessness, or willfully wasting or
   damaging materials or supplies.

3. Theft or removal from the premises without
   proper authorization any Company property or
   the property of any employee.

4. Sabotage (per federal or state law).

5. Conviction of a violation of the Espionage
   Act.

6. False statements on employment application or
   giving false information at the time of
   employment as to a pertinent item.

7. Immoral conduct or indecent behavior on
   Company premises.

8. Fighting or attempting bodily injury to
   another on Company premises   (this does not
   include action taken in self-defense) or
   provoking a fight on Company premises.

9. Deliberate falsification of production
   reports, time reports, or other similar
   reports.

Shop Rules, Continued

10. Intentionally and knowingly punching another
    employee's time card.

11. Misusing, destroying, or damaging Company
    property or property of any employee.

12. Making of false, vicious, or malicious
    statements concerning any employee, the
    Union, the Company, or its products.

13. Using alcohol or narcotics on Company
    premises, or reporting for work while
    obviously under the influence of alcohol or
    narcotics.

14. Interfering or refusing to cooperate with the
    plant protection officers in the performance
    of their duties.

15. Sleeping on the job during working hours.

16. Insubordination (refusing or failing to obey
    an order from proper authority).

17. Mistakes due to carelessness.

18. Altering or defacing Company or Union notices
    on bulletin boards.

19. Distributing written or printed matter of any
    description on Company premises, unless
    approved by the Personnel Department; posting
    or removal of notices or signs, writing or
    marking on Company property, without authori-
    zation from the Company.

20. Creating or contributing to unsanitary
    conditions or poor housekeeping.

110

21. Engaging in horseplay, running, scuffling, or throwing things.

22. Gambling or engaging in a lottery on Company premises.

23. Violating a safety rule or safety practice.

24. Failure to observe parking and traffic regulations on Company premises.

25. Failure to carry out a known and specified work procedure. Any instruction to deviate from such procedure must be in written form.

26. Disturbing or interfering with the harmonious relationship between the Company and the Union.

27. Use or possession of another employee's tools without the employee's consent.

28. Engaging in work of a personal nature on Company time and/or property.

29. Soliciting of any kind on Company premises at any time without authorization.

30. Entering the production area of the plant any time other than regular scheduled work shift.

THE ABOVE DOES NOT IMPLY THAT THERE ARE NO OTHER REASONS THAT THE COMPANY MAY DEEM CAUSE FOR DISCIPLINARY ACTION, INCLUDING DISCHARGE.

Scott Guernsey
Manager Personnel & Industrial Relations

# INDEX

Page

Absenteeism and tardiness ...................... 17
Accidental death and dismemberment insurance .. 76
Alternate placement ........................... 28
Annual inventory .............................. 91
Application of COLA to earnings ............... 57

Bereavement pay ............................... 60
Bulletin boards ............................... 83
Bumping ....................................... 28

Call back pay ................................. 48
Changes of address ............................ 86
COLA amounts .................................. 58
Compensable injuries .......................... 86
Complete agreement ............................ 85
Contract preemption ........................... 84
Cost-of-living allowance (COLA) ............... 56
Credit union payroll deduction ................ 86

Daily overtime ................................ 41
Dental insurance .............................. 81
Disability placement option ................... 17
Disciplinary hearings ......................... 16
Disciplinary protests ......................... 17
Discipline and discharge, general ............. 15
Discipline penalty limit ...................... 16

Educational leaves ............................ 40
Extrusion die repair training program ......... 98

Grievance steps ............................... 8
Group leaders ................................. 87

Holiday celebration dates ..................... 64
Holiday pay computation ................... 47, 65
Holidays and eligibility ...................... 63

Page

Home department recall ......................... 21
Hours of work .................................. 41
Humanitarian placement ......................... 36
Inspection department seniority
        administration .......................... 89
Insurance coverage dates ....................... 81
Insurance, general ............................. 74

Job posting ............................... 20, 24
Job transfer requests .......................... 22
Journeyman definition .......................... 96
Jury duty ...................................... 62

Layoffs ........................................ 26
Layoff, temporary .............................. 33
Leaves of absence .............................. 37
Life insurance ................................. 76

Mailing lists .................................. 85
Management rights ............................... 4
Medical insurance .............................. 80
Medical leave .................................. 37
Memorandums of understanding ................... 87

New pay rate ................................... 55
Nondiscrimination ............................... 2
Nondiscrimination in Union membership .......... 3

Off-shift Union plant entry .................... 14
Other work during leave ........................ 39
Overtime ....................................... 41
Overtime distribution .......................... 88
Overtime equalization .......................... 43
Overtime, notice of ............................ 42
Overtime, pyramiding of ........................ 42
Overtime, Saturday ............................. 42

Index, Continued

Page

Overtime, Sunday and Holidays .................. 42
Overtime work opportunities ................... 42

Paychecks ..................................... 48
Pay rate, production standard and health
       and safety grievances ................... 13
Peace Corps leave ............................. 40
Pension plan changes .......................... 70
Pension plan, general ......................... 70
Permanent work force increases ............... 19
Permanent work force reductions .............. 26
Pregnancy leave ............................... 40
Printing of contract .......................... 86
Probationary period ........................... 18
Production standards .......................... 5

Recalls following layoff .................. 25, 33
Report pay .................................... 47
Representation scope .......................... 1
Retirees, future .............................. 70
Retirees, past ................................ 70
Rule violation penalties ...................... 16

Safety ................................... 84, 89
Seniority, alternate placement ................ 29
Seniority, breakoff ........................... 33
Seniority continuation ........................ 41
Seniority coverage ............................ 19
Seniority definitions and application ......... 18
Seniority, departmental ....................... 18
Seniority lists and Union officer lists ....... 35
Seniority outside of skilled trades ........... 96
Seniority, preferential ....................... 31
Seniority upon transfer ....................... 28
Shift designation ............................. 47
Shift preference .............................. 36

Page

Shift premium ................................ 48
Skilled trades, apprenticeship standards ...... 98
Skilled trades, definition .................... 94
Skilled trades employment ..................... 95
Skilled trades, labor agreement application ... 98
Skilled trades, layoff and recall ............. 97
Skilled trades, occupational seniority ........ 95
Skilled trades occupations .................... 98
Subcontracting ................................ 5
Supervisors seniority bargaining unit work .... 32

Termination and modification .................105
Temporary transfer ............................ 30
Transfers ..................................... 22
Transition and bridge benefits ................ 77
Trustee reports ............................... 85

Union accommodations .......................... 90
Union and political leaves .................... 39
Union bargaining committee .................... 5
Union membership cessation .................... 4
Union representation on overtime .............. 45
Union shop .................................... 2
Union stewards ................................ 6
Union time away from plant .................... 46
Union time in contract negotiations .......... 46
Union time, permission for .................... 13
Unions, other ................................. 2

Vacation pay .................................. 68
Vacation time off ............................. 67
Validity of agreement ......................... 84
Vending machine proceeds ...................... 90

Wage administration ........................... 53
Wages ......................................... 49

Index, Continued

Page

Weekly sickness and accident benefits ........  79
Workmen's Compensation offset to pension
    benefits ................................  72

116

LETTER OF AGREEMENT

This Letter of Agreement entered into by Bohn Aluminum and Brass Division,
Holland, Michigan, Plants 16 and 19, and Local 1402 and the International
Union, United Automobile, Aerospace, and Agricultural Implement Workers of
America (UAW), hereinafter referred to as the Parties, sets forth the terms
and conditions pertinent to the establishment of a two-tier wage program for
those two facilities.  This agreement is appended to and shall be made part
of the Collective Bargaining Agreement that commenced September 21, 1986.

Following are the details specifically agreed to by the Parties:

1.  Commencing January 1, 1987, a two-tier wage program, as reflected in
    Schedule B1 (attached), shall be implemented.  The second-tier wage
    schedule will apply to all positions enumerated on the schedule and
    hired on or after January 1, 1987.  All current employees in the
    first-tier current wage schedule will remain in the first tier
    despite department/plant changes, classification changes, and
    layoffs as long as their seniority is maintained.

2.  The Company agrees that it will not, during the term of this
    agreement, transfer work from its Holland, Michigan locations to
    other facilities and will strive to seek additional business.  It
    is the Company's intention to maintain, promote, and update its
    Holland, Michigan facilities, realizing changes may become necessary
    due to circumstances beyond the Company's control or due to "acts of
    God"; therefore, the foregoing shall not be construed as a guarantee
    of work or jobs.  The foregoing language in this paragraph shall
    make inoperative, for the life of this agreement, Article XVIII.

3.  In consideration for the Union agreeing to the two-tier wage
    program, the Company guarantees that in the event business
    necessitates concessionary bargaining in subsequent negotiations,
    such negotiations shall address the concession issue across the full
    spectrum of its bargaining unit employees.

4.  Bargaining unit employees hired before January 1, 1987, who command
    job classifications exclusive of Extrusion Die Repair, Extrusion Die
    Maker, Maintenance, and Tool and Die Makers, and who are on the
    active payroll, and who elect to voluntarily terminate their
    employment from the Company, shall be paid an eight thousand dollar
    ($8000) separation bonus.  This bonus shall be paid if termination
    occurs within ninety (90) days of January 1, 1987.

5.  The general wage increases established for the second and third
    years of the current Collective Bargaining Agreement shall apply to
    both tiers of Schedule B1.

-2-

The foregoing represents the full and unabridged agreement relative to the
establishment of a two-tier wage program for the aforementioned Parties.

_2-12-87_
Date

_2-12-87_
Date

For the Company:

For the Union:

SCHEDULE B1

TWO-TIER WAGE SYSTEM

| JOB CLASSIFICATION | CURRENT RATE | 2ND TIER |
|---|---|---|
| Janitor – Sweeper | 10.29 | 6.59 |
| Labor – Material Handler | 10.41 | 6.71 |
| Production Helper | 10.69 | 6.99 |
| (Fab, Forge, Ext., Ship. & Rec., Paint) | | |
| Machine Loader | 10.69 | 6.99 |
| Inspect & Pack Plant 19 | 10.69 | 6.99 |
| Ultra Sonic/Inspection Machine Opr. | 10.73 | 7.03 |
| Tank Maintenance | 10.75 | 7.05 |
| Tool Keeper | 10.77 | 7.07 |
| Ext. Die-Head Opr. | 10.77 | 7.07 |
| Fab Anodize Hoist Opr. | 10.79 | 7.09 |
| Forge Chamfer Opr. | 10.80 | 7.10 |
| Forge Grinder Opr. | 10.80 | 7.10 |
| Piston Machine Grinder | 10.80 | 7.10 |
| Silkscreener | 10.81 | 7.11 |
| Line Sander Opr. (Machine Opr. only) | 10.82 | 7.12 |
| Fab Anodize Rack Maker | 10.83 | 7.13 |
| Gas Welder | 10.84 | 7.14 |
| Torch Brazer | 10.84 | 7.14 |
| Block Setter-Cutter Grinder | 10.84 | 7.14 |
| Lea, Sand & Deburr | 10.85 | 7.15 |
| Stockkeeper | 10.86 | 7.16 |
| Warehouseman | 10.87 | 7.17 |
| Extrusion Billet Saw/Utility | 10.87 | 7.17 |
| Oiler | 10.91 | 7.21 |
| Laboratory Helper | 10.96 | 7.26 |
| Fab Setup | 10.99 | 7.29 |
| Piston Setup | 10.99 | 7.29 |
| Floor Inspector | 11.05 | 7.35 |
| Hand Buffing | 11.13 | 7.43 |
| Ext. Press Opr. | 11.16 | 7.46 |
| Forge Press Opr. | 11.16 | 7.46 |
| Truck Driver | 11.22 | 7.52 |
| CNC Opr. & Setup | 11.25 | 7.55 |
| Set-Up Lineman | 11.25 | 7.55 |
| Sample Maker | 11.57 | 7.87 |
| Layout Inspector | 11.66 | 7.96 |
| Extrusion Die Repair | 12.13 | 12.13 |
| Extrusion Die Maker | 12.43 | 12.43 |
| Maintenance | 12.63 | 12.63 |
| Tool & Die Makers | 12.79 | 12.79 |