UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

INTERNATIONAL UNION, UNITED
AUTOMOBILE AEROSPACE AND
AGRICULTURAL WORKERS OF
AMERICA, UAW, and its LOCAL 1402,

Case No.: 1:11-cv-28

and

Hon. Robert J. Jonker
United States District Judge

RONALD CLAPP, ROBERT RIETVELD,
ANN SKILES, and JOHN CHESTER, as
individuals, on behalf of themselves and
all persons similarly situated,

        Plaintiffs,
v.

HYDRO AUTOMOTIVE STRUCTURES,
INC., HYDRO AUTOMOTIVE
STRUCTURES NORTH AMERICA, INC.,
HYDRO ALUMINUM ADRIAN, INC., and
HYDRO AUTOMOTIVE STRUCTURES
NORTH AMERICA, INC. WELFARE
BENEFIT PLAN FOR UNION
EMPLOYEES.

        Defendants.

---

## INDEX OF EXHIBITS 11 (Part 2)
## TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

---

**EXHIBIT NUMBER**

11 (Part 2)

**DESCRIPTION OF EXHIBIT**

1990-1993 UAW - Hydro Contract From UAW
Archives

will lose their holiday pay if such tardiness exceeds one-half (1/2) hour during the employee's scheduled work hours for that day. Employees absent on such last scheduled work day and next scheduled work day for reasons of illness must furnish proof of illness acceptable to the Company's Human Resource Department indicating that the employee was physically incapable of working.

SECTION 2. HOLIDAY CELEBRATION DATES. The dates on which various holidays are celebrated during the period of this contract afford time off between the Christmas and the New Year's holidays. In the event an otherwise eligible employee is caused to work on a day subsequently designated as a holiday, he will be eligible for premium pay as prescribed by this contract; however, in the event an otherwise eligible employee is caused to work on a holiday subsequently designated to be celebrated on another date, he will be paid in accordance with pay policies established for work performed on any regular work day during any regular work week. The following list reflects those paid holidays which will be recognized by the new contract.

| 1990-1991 | 1991-1992 | 1992-1993 |
|---|---|---|
| 11-22-90/Thursday | 11-28-91/Thursday | 11-26-92/Thursday |
| 11-23-90/Friday | 11-29-91/Friday | 11-27-92/Friday |
| 12-24-90/Monday | 12-24-91/Tuesday | 12-24-92/Thursday |
| 12-25-90/Tuesday | 12-25-91/Wednesday | 12-25-92/Friday |
| 12-31-90/Monday | 12-31-91/Tuesday | 12-31-92/Thursday |
| 01-01-91/Tuesday | 01-01-92/Wednesday | 01-01-93/Friday |
| 03-29-91/Friday | 04-17-92/Friday | 04-09-93/Friday |
| 05-27-91/Monday | 05-25-92/Monday | 05-31-93/Monday |
| 07-04-91/Thursday | 07-03-92/Friday* | 07-05-93/Monday |
| 09-02-91/Monday | 09-07-92/Monday | 09-06-93/Monday |

*The parties agree that with the exception of critical or essential operations, the company will not schedule Saturday overtime work for Saturday, July 4, 1992.

The periods between Christmas and New Year's Day shall be recognized as working time if required by customer demand.

SECTION 3.   HOLIDAY PAY COMPUTATION.   Holiday pay shall be for eight (8) hours at the eligible employee's straight time regular rate exclusive of shift differential or overtime.

SECTION 4.   ELIGIBILITY MODIFICATIONS.

A.    Employees with seniority who have been laid off in a reduction of force during the work week prior to or during the week in which the holiday occurs will receive holiday pay.

B.    Employees with seniority who are absent from work during a regularly scheduled work week during which one (1) of the above mentioned holidays falls, due to approved leave of absence or sick leave commencing not more than one (1) week prior to or terminating not more than one (1) week after the week in which the holiday falls, shall receive holiday pay.

C.    When one of the above holidays falls within an eligible employee's approved vacation period, and he is absent from work during his regularly scheduled work week because of such vacation, he shall be paid for such holiday.

D.   When a holiday falls on Saturday, eligible employees shall receive holiday pay, provided they have worked the full scheduled shift on the last preceding scheduled work day within the week in which that holiday falls. When a holiday falls on a Sunday, holiday pay will be given for the following day if that day is observed by the federal government as a holiday.

E.   An employee who works on a holiday will receive holiday pay if otherwise eligible under the holiday procedure and will also be paid double his normal straight-time earnings for such hours worked.

F.   Employees who have accepted holiday work assignments and failed to report for and perform such work shall not receive holiday pay.

G.   Employees who are eligible to receive holiday pay under this procedure and work part of a shift that falls within the holiday shall receive straight time for such work on a holiday.

H.   For each Christmas holiday period (i.e., the holidays scheduled between Christmas and New Year's each calendar year), an employee must work the last scheduled day prior to each holiday period and the next scheduled work day after each holiday period. Failure to work either the last scheduled work day prior to or the next scheduled work day after each holiday period will disqualify the employee from

holiday pay for the two (2) holidays immediately succeeding or immediately preceding such scheduled work day.

I. An employee who commences receiving pension benefits on January 1 and is otherwise eligible for Christmas holiday period pay up to and including December 31 of the previous year will receive such holiday pay.

J.      Employees laid off during the period beginning two (2) weeks prior to the Christmas shutdown period and ending during the week following the Christmas shutdown period will be eligible for Christmas holiday period pay.


## ARTICLE XIII - VACATION PROVISIONS

SECTION 1.  VACATION TIME OFF.  Each employee who, on January 1, has one (1) or more years of seniority, shall be entitled to vacation pay as provided in this Article's Section 2; and, if such employee has worked one thousand forty (1040) hours or more during the twelve (12) consecutive calendar months immediately preceding his date of hire, he shall be entitled to time off work in accordance with the following table.

| Service on Qualifying Date | Time Off |
| --- | --- |
| One (1) to two (2) years' service | One (1) week off |
| Two (2) to eight (8) years' service | Two (2) weeks off |
| Eight (8) to fifteen (15) years' service | Three (3) weeks off |
| Fifteen (15) years' service and over | Four (4) weeks off |

An employee who moves to a new length-of-service bracket on his anniversary hire date will be allowed vacation leave corresponding to the number of weeks for that particular year that his new bracket calls for. For example: An employee whose eighth (8th) anniversary hire date falls on September 1 is entitled to two (2) weeks' vacation time off prior to September 1. After September 1, he would be eligible for an additional one (1) week, for a total of three (3) weeks in that calendar year.

Requests for vacation time off must be made and approved by the Company at least four (4) weeks in advance, and the Company reserves the right to limit the number of leaves in any department at one time to ensure the continued efficient operation of the department.

Vacations will be allocated by seniority, except in those cases where such allocation would result in a shortage of experienced employees within the department, in which event the Company will retain the necessary employees to maintain the efficient operation of the department.

Time lost on account of industrial accidents or occupational disease, as well as time lost away from the plant by Union representatives on official Union business, shall be counted as time worked for the purpose of this section.

Vacation time unused in any calendar year shall be of no value or credit in any other year, except for one (1) week, which may be banked.

SECTION 2.  VACATION PAY.

A.  Vacation pay will be computed in accordance with the following:

| Seniority on December 31 | % of All Earnings Except Vacation Pay During the Calendar Year |
|---|---|
| One (1) year but less than three (3) years | 3.5% |
| Three (3) years but less than five (5) years | 4.5% |
| Five (5) years but less than ten (10) years | 6.0% |
| Ten (10) years but less than fifteen (15) years | 7.0% |
| Fifteen (15) years but less than twenty (20) years | 8.0% |
| Twenty (20) years or over | 8.5% |

B.  Employees who quit or are discharged shall receive the percentage of their vacation bonus that is equal to the percentage of hours worked in the calendar year in which they quit or are discharged, provided they have accumulated one (1) or more years' seniority at the date of quitting or discharge.

C.  Employees who retire under the terms of Article XIV of this Agreement will receive vacation bonus for the portion of the year during which they were active employees, but will not be entitled to any vacation bonus for any period after the date of retirement.

D.  For each year during the life of this Agreement, the vacation bonus will be paid no later than the pay period immediately preceding February 15 in the year following the calendar year in which the vacation bonus was earned.

## ARTICLE XIV - PENSION PLAN

SECTION 1.  GENERAL.  Although reflected in a separate document, the pension plan which was in effect during the life of the contract that expired on September 2, 1986, will continue as part of this labor agreement and will continue in effect during the new contract's life at Company expense.  In addition, the improvements described in subsequent sections of this Article will be placed into effect on the dates indicated, at Company expense, and will be reflected in the pension plan's text.

SECTION 2.  FUTURE RETIREES.  The basic benefit level per month per year of credited service for otherwise eligible employees who retire under the pension plan's normal, early, disability, or vested deferred provisions on or about October 1, 1986, will be $10.75 per month per year of credited service; $11.50 per month per year of credited service on and after October 1, 1987; and $12.25 per month per year of credited service on and after October 1, 1988.  Applicable actuarial reduction formulas specified within the pension plan will continue in effect.  The benefit level per month per year of credited service in effect at the time a vested employee's service terminates will continue to

be the basis for determining the monthly benefit amount when he is eligible to receive such benefits.

SECTION 3.  PAST RETIREES AND SURVIVING SPOUSES.  On and after October 1, 1978, the pension benefit of former employees, and surviving spouses of former employees, who retired under the normal, early, vested deferred, or disability features of the pension plan prior to October 1, 1978, will be increased fifty cents ($.50) per month per year of credited service.

On and after October 1, 1978, the pension benefit of former employees, and surviving spouses of former employees, who retired under the normal, early, vested, deferred, or disability features of the pension plan prior to October 1, 1978, will be increased by fifty cents ($.50) per month per year of credited service in effect at the time a vested employee's service terminates will continue to be the basis for determining the monthly benefit amount when he is eligible to receive such benefits.

Article XIV Continued

SECTION 4.  OTHER PENSION PLAN CHANGES.

A.  MILITARY CREDITED SERVICE.  Pursuant to the Selective Service Act, an employee who left or leaves the Company's employ and who returned or returns to the Company's employ will be credited with pension plan credited service lost while serving in the military of the United states government; however, in no case will the reinstatement of

such credits serve to afford more pension plan credited service than such employee would have earned as a full-time employee of the Company during the time he served in the military.

B.  EARLY RETIREMENT AGE. An otherwise eligible employee may continue to retire at age fifty-five (55); however, the pension plan's early retirement reduction formula will apply to the applicable basic benefit level per month per year of credited service.

C.  SURVIVOR'S OPTION ELIGIBILITY. The survivor's option feature will apply to an otherwise eligible employee, including a disability retiree, at age fifty-five (55).

D.  PENSION BOARD MEMBER INSURANCE EXPENSE. Any insurance expense for joint Pension Board members which the ERISA Law may require will be paid by the Company.

E.  ERISA EFFECTS UPON PENSION PLAN. Any changes to the pension plan required by the ERISA Law will not reduce negotiated pension benefits.

F.  PENSION BOOKLETS. Subsequent to including ERISA Law-mandated changes in the pension plan, the complete plan text will be printed, reproduced in sufficient quantity, and distributed to all employees covered by this agreement.

G.  Effective January 1, 1979, employees whose effective date of retirement is on or after January 1, 1979, and whose total years of credited service is thirty (30) or more, and whose age at date of retirement is at least fifty five (55) years,

but less than sixty-two (62), shall receive the basic benefit payable under the plan plus a supplemental benefit, the sum of which shall equal five hundred dollars ($500) per month. Payment of the supplemental benefit to a retiree under this provision shall cease on the retiree's sixty-second (62nd) birthday.

H.  Effective October 1, 1978, the surviving spouse benefit shall be increased from fifty-five percent (55%) to sixty percent (60%) for employees retiring on or after October 1, 1978.

I.  Pension benefit improvements which become effective with the signing of this agreement shall be funded over a period of thirty (30) years or less.

J.  Effective October 1, 1978, the Company will contribute eight dollars and twenty cents ($8.20) per month toward the cost of Medicare coverage for eligible retirees and surviving spouses.

K.  Upon receipt of a duly signed checkoff authorization, the Company agrees to withhold a maximum of one dollar ($1.00) per month from the pension benefit of eligible retirees. Such monies are to be paid to the Local Union as monthly dues.

L.  All provisions of the present pension plan not modified above will remain as at present.

## ARTICLE XV - INSURANCE

SECTION 1.   GENERAL.   Except as otherwise provided by and changed in this Agreement, life, accidental death and dismemberment, transition and bridge, weekly indemnity, and medical insurance coverages (i.e., hospitalization and surgical) for inactive payroll employees which were in effect during the life of the contract that expired on September 2, 1986, will continue in effect during the new agreement's life.   Policies regarding eligibility for coverage and coverage effective dates which prevailed during the life of the contract that expired September 2, 1986, and which are unchanged by this Article, will continue in effect during this labor agreement's life.

### SUMMARY OF BENEFITS IN EFFECT
### NOVEMBER 8, 1990

| Benefits | Benefit Amounts |
|---|---|
| Life insurance for active payroll employees | $ 15,000 |
| Dependent insurance: | |
|     Spouse | $  2,000 |
|     Dependent children between the ages of six (6) months and nineteen (19) years | $  2,000 |
|     Dependent children between the ages of five (5) days and six (6) months | $    500 |
| Life insurance for pension plan retirees | $  1,000 |
| Accidental death and dismemberment insurance for active payroll employees | $ 15,000 |

| Benefits | Benefit Amounts |
|---|---|

Survivor income benefit insurance:

    Transition (twenty four
    (24) months)                   $175/month

    Bridge                           $175/month

Weekly sickness and accident
benefits for employees
(Commencing the first day of an
accident and the fourth day of
a sickness for a maximum period
of twenty six (26) weeks.)            $145/week

Medical insurance (employee and
dependents):

    Michigan Blue Cross/Blue
    Shield CMM 100/200,
    80-20 plan (or equivalent
    alternate carrier coverage)
    with $1000 stop loss after
    deductible is paid, BC/BS
    to pay reasonable and
    customary (R&C) charges;
    employees to co-pay five
    percent (5%) of monthly
    premium amount

SECTION 2.  LIFE INSURANCE.  Effective November 8, 1990, the insurance coverage for otherwise eligible active payroll employees will be increased from thirteen thousand dollars ($13,000) to fifteen thousand dollars ($15,000).  Effective November 8, 1991, life insurance coverage for otherwise eligible active payroll employees will be increased from fifteen thousand dollars ($15,000) to seventeen thousand dollars ($17,000), and effective November 8, 1992 life insurance coverage for otherwise eligible active payroll employees will be increased from

seventeen thousand dollars ($17,000) to twenty thousand dollars ($20,000).

SECTION 3. ACCIDENTAL DEATH AND DISMEMBERMENT INSURANCE. Effective November 8, 1990, accidental death and dismemberment insurance for otherwise eligible active payroll employees will be increased from eleven thousand dollars ($11,000) to fifteen thousand dollars ($15,000); effective November 8, 1991, accidental death and dismemberment insurance for otherwise eligible active payroll employees will be increased to seventeen thousand dollars ($17,000), and effective November 8, 1992, coverage will increase to twenty thousand dollars ($20,000).

SECTION 4. TRANSITION AND BRIDGE BENEFITS.

A.  TRANSITION BENEFITS ELIGIBILITY.  The transition benefit monthly payment will commence on the first day of the month following your death.  This payment will continue for twenty four (24) months or until you are not survived by anyone who qualifies as an eligible survivor, whichever occurs first. The transition benefit will be paid in order of priority to:

1.  Your widow or widower, if she or he was lawfully married to you for at least one (1) year immediately prior to your death.

2.  Your unmarried child or children under twenty one (21) years of age at the time each monthly benefit becomes payable.

73

3. Your parent or parents for whom you provided at least fifty percent (50%) support during the calendar year preceding the year in which your death occurred or you became continuously disabled until death.

(Since more than one individual may qualify under 2 and 3 above, the monthly benefit will be divided equally among the survivors.)

B. BRIDGE BENEFIT ELIGIBILITY. The bridge benefit is payable to your widow or widower in the form of monthly income benefits and will begin on the first day of the month following receipt of the last transition benefit payment. Your spouse must have been at least forty eight (48) but under sixty (60) years of age at the time of your death, and not remarried at the time this benefit commences. Also, if your spouse receives Social Security benefits for your dependent children, the bridge benefit will not become payable until the Social Security benefits cease.

The bridge benefit will terminate when your spouse:

1. Remarries.

2. Attains age sixty-two (62) or any younger age at which full widow or widower's insurance benefits are payable under the Federal Social Security Act.

3. Ceases to qualify as an eligible survivor.

4. Dies.

D. TRANSITION AND BRIDGE DISABILITY BENEFIT. In case of total disability while insured, your survivor income benefit

insurance will be continued without further cost for as long as you remain totally disabled, if:

1.  The disability starts before your sixtieth (60th) birthday, and, in all probability, you will be unable to engage in any work for an extended period of time, and

2.  At the time you become so disabled, you have an eligible survivor.

SECTION 5. WEEKLY SICKNESS AND ACCIDENT BENEFITS.

A.  WEEKLY BENEFIT LEVEL IMPROVEMENTS. For new claims originating on and after November 8, 1990, the weekly benefit level will be increased from one hundred forty dollars ($140.00) to one hundred forty-five dollars ($145.00), which benefit will increase to one hundred fifty dollars ($150.00) per week effective November 8, 1991 and to one hundred fifty-five dollars ($155.00) per week effective November 8, 1992.

B.  WEEKLY SICK AND ACCIDENT BENEFITS AND DISPUTED WORKMEN'S COMPENSATION CLAIMS. Weekly sickness and accident benefits will be payable to a Workmen's Compensation claimant whose disabling circumstances commence on and after October 1, 1978, as hereafter provided. Subject to the completion of a reimbursement agreement form provided by the Company, disability advances shall be paid to a claimant for weekly sickness and accident benefits who has alleged that the

disabling circumstance is work-related when the Company does not voluntarily accept liability under existing Workmen's compensation laws, providing medical evidence of total and continuous disability satisfactory to the insurance carrier is submitted. Such payments will cease should the Company's insurance carrier subsequently determine that a claimant is not eligible for weekly sickness and accident benefits.

In the event it is subsequently determined that weekly sickness and accident benefits remitted in this circumstance should not have been paid and/or should have been paid in a lesser amount, written notice shall be given to the claimant, and he shall repay the entire amount or the amount of overpayment to the insurance carrier. If the claimant fails to repay promptly, the insurance carrier shall recover the amount due and owing by making an appropriate deduction or deductions from any future benefit payment or payments payable to the employee under the group insurance program, or may cause the Company to make the appropriate deductions from future compensation payable by the Company to the claimant.

C.  WEEKLY SICK AND ACCIDENT DURING MATERNITY LEAVE. The Company agrees to indemnify Local Number 1402 and the International Union against possible liability in a suit seeking to require the inclusion of maternity benefits in sickness and accident insurance coverage to a greater extent

than the current program provides. The Company agrees to comply with the final litigation in this regard.

SECTION 6. MEDICAL INSURANCE.

A.   CMM 100/200, 80-20 PLAN.   Effective November 8, 1990, eligible employees and their dependents will be covered by the Michigan Blue Cross/Blue Shield CMM 100/200, 80-20 plan (or equivalent alternate carrier coverage), with a $1000 stop loss (after deductibles are met), BC/BS (or alternate) to reimburse eligible, covered employees for reasonable and customary charges (R&C) pursuant to BC/BS's (or alternate's) schedule of reimbursable payments.   Employees shall co-pay 5% of the monthly premium, said co-pay amounts to be deducted from gross pay rather than net pay under Internal Revenue Code Section 125.

B.   PAST RETIREE (PRE - 11/08/90) MEDICAL INSURANCE COVERAGE
     During the term of this Agreement Past Retiree Medical Insurance Coverage will be as follows:

     1.   B-77 Program.   Effective November 8, 1990, eligible past retirees (and their dependents) who have retired from active service under the Pension Plan will be covered by the Michigan Blue Cross/Blue Shield B-77 Program (or equivalent alternate carrier coverage), including the FAE-VST-Reciprocity Rider.   The cost of such retiree group coverage shall be equally borne by the Company and the retiree electing the coverage.

77

2. **Master Medical Program.** Effective November 8, 1990, eligible past retirees (and their dependents) who have retired from active service under the Pension Plan will be covered by the Michigan Blue Cross/Blue Shield 80/20 co-pay master medical program (or equivalent alternate carrier coverage). Deductibles under this plan shall be one hundred dollars ($100.00) individuals and two hundred dollars ($200.00) family. The cost of such retiree group coverage shall be equally borne by the Company and the retiree electing the coverage.

3. **Drug Coverage.** Effective November 8, 1990, coverage for past retirees only under the previous contract's medical insurance program's two dollar ($2.00) co-pay drug rider under the pension plan, will continue in force and to be fully paid by the Company.

4. **Medicare Co-Payment.** During the life of this Agreement the Company will continue to contribute eight dollars and twenty cents ($8.20) per month toward the cost of medical coverage for eligible past retirees and surviving spouses.

5. **Premium Co-Payment.** Retiree group premium co-payments must be paid on a monthly basis and may be made by cash payment or by authorized reduction in the retiree's monthly retirement benefits.

C.  FUTURE RETIREE MEDICAL INSURANCE COVERAGE

Future retirees (those who retire subsequent to the effective date of this Agreement) will be covered pursuant to the changes in medical coverage reflected by this Agreement.  This includes:

1.  **CMM 80-20 Plan with $100/$200 Deductible.**

Effective November 8, 1990, employees retiring from active service (and their dependents) will be covered by the Michigan Blue Cross/Blue Shield CMM 80/20-$100/$200 Deductible Plan (or equivalent alternate carrier coverage), with a $1,000 stop loss (after deductibles are met).

Blue Cross/Blue Shield (or alternate carrier) to reimburse eligible covered retirees for reasonable and customary charges (R & C) pursuant to Blue Cross/Blue Shield's (or alternate's) schedule of reimbursable payments.

The cost of such retiree group coverage shall be equally borne by the Company and the retiree electing the coverage.

2.  **Medicare Co-Payment.**  During the life of this Agreement the Company will continue to contribute eight dollars and twenty cents ($8.20) per month toward the cost of medicare coverage for eligible retirees and surviving spouses.

79

3. **Premium Co-Payment.**  Retiree group premium co-payments must be paid on a monthly basis and may be made by cash payment or by authorized reduction in the retiree's monthly retirement benefits.

SECTION 7.   DENTAL INSURANCE COVERAGE.   Effective on and after September 3, 1978, eligible employees and their covered dependents will continue to be provided dental program insurance coverage at Company expense.  Coverage effective dates will be as per this Article's Section 8.

SECTION 8.   INSURANCE COVERAGE EFFECTIVE DATES.

A.   Group insurance coverage (i.e., life, AD&D, dependent life, transition and bridge, weekly sickness and accident) and medical insurance coverages for a new hire or a rehired employee will become effective on the thirty first (31st) day of employment, providing such employee is on the active payroll on such day.

B.   For an employee reinstated from the inactive to the active payroll, group and medical insurance coverages provided by this agreement will become effective on the effective date of placement onto the active payroll.

C.   Except for Company-paid group and medical insurance coverages hereinbefore specified for employees who retire under this agreement's pension plan, all Company-paid group

and medical insurance coverages will cease on the first day immediately following termination of seniority.

D.  Company-paid group and medical insurance coverages for inactive payroll employees will be continued in accordance with the following:

    1.  Life, dependent life, AD&D, transition and bridge, and medical insurance coverages will be afforded to employees who become inactive by reason of layoff, vacation leave, personal leave, or any other approved leave for two (2) calendar months following the month in which such leaves commence.

    2.  Life, dependent life, AD&D, transition and bridge, and medical insurance coverages will be afforded to employees who become inactive by reason of an approved non-industrial injury and/or sickness, or maternity leave for six (6) calendar months immediately following the month in which such approved leaves commence.

E.  An employee who becomes inactive by reason of layoff and/or an approved leave may purchase medical insurance coverage for eighteen (18) months immediately following the last month for which the Company remits insurance premiums in behalf of the inactive employee by making advance payments to the Company's personnel office.

F.  An employee who becomes inactive by reason of an industrial injury and/or illness shall continue to be provided with

coverages for life, dependent life, AD&D, transition and bridge, and medical insurance for a period not to exceed one (1) year. Cost of such coverages will be fully paid by the Company.

SECTION 9. INSURANCE HIGHLIGHT BOOKLETS. Descriptions of benefits and eligibility requirements which prevailed during the immediately preceding labor agreement's term and improvements to which reference is herein made will be reflected in insurance highlight booklets which the Company will request the respective carriers to provide covered employees.

SECTION 10. EYEGLASS PURCHASE. Effective September 3, 1983, the Company will make available to dependents of employees (those eligible for hospital/medical insurance coverage) the option to purchase eyeglasses through the Company on the same basis as such program has previously been available to employees.

## ARTICLE XVI - GENERAL

SECTION 1. BULLETIN BOARDS. The Company shall permit the use by the Union a sufficient space on the Company's bulletin board for the posting of notices restricted as follows:

A. Notice of Union recreational and social affairs.

B. Notice of Union elections, appointments, and results of Union elections pertaining to the plant or department involved.

C.   Notice of Union meetings.

All such notices must be submitted to the Company for approval before posting.

SECTION 2.   SAFETY.   The Company shall continue to make reasonable provisions for the safety and health of its employees during the hours of their employment, as it has prior to the signing of this Agreement through the maintenance of its protective devices and equipment in accordance with the requirements of the state law.

In order to carry out the intent of this section, the Union shall appoint three (3) of its members to serve on the Safety Committee.   The Safety Committee shall meet at least once each month.   Special meetings may be held when conditions warrant. Unsafe conditions shall be reported first to the supervisor of the area.   The Company will make available to the chairman of the Safety Committee its OSHA log or Workers Compensation Form 200's, which may be reviewed once per week in the Human Resource Department.

SECTION 3.   CONTRACT PREEMPTION.   Any agreement made by representatives of either party which is not consistent with the terms of this contract shall be of no force and effect.

SECTION 4.   VALIDITY OF AGREEMENT.   This Agreement supersedes all prior agreements and understandings, oral or written, except as

they are expressly reaffirmed or incorporated herein. Should any term or terms of this Agreement be or become wholly or partly in conflict with the laws existing during the terms of this Agreement, the validity of the balance of this Agreement shall in no way be affected, and this Agreement shall be deemed modified to conform to the provisions of said existing laws.

SECTION 5. COMPLETE AGREEMENT. The parties acknowledge that during the negotiations which resulted in this Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining, and that the understandings and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this Agreement. Therefore, the Company and the Union, for the life of this Agreement, each voluntarily and unqualifiedly waives the right, and each agrees that the other shall not be obligated, to bargain collectively with respect to any subject or matter referred to or covered in this Agreement or with respect to any subject or matter not specifically referred to or covered in this Agreement, even though such subject or matter may not have been within the knowledge or contemplation of either or both of the parties at the time that they negotiated or signed this Agreement.

SECTION 6. TRUSTEE REPORTS. Copies of all trustees' reports of all benefit plans shall be provided to the International Union, UAW, Solidarity House, Detroit, Michigan (8000 East Jefferson Avenue), and to the Regional Director, 3300 Leonard, N.E., Grand Rapids, Michigan 49546-1026.

SECTION 7. MAILING LISTS. Within thirty (30) days after the ratification of this Agreement and every six (6) months thereafter during the term of this Agreement, the Company shall give to the International Union the names of all retirees, as well as employees covered by this Agreement, together with their addresses and Social Security numbers as they appear on the records of the Company. The International Union shall receive and retain such information in confidence and shall disclose it only to those officials of the Union whose duties require them to have such information.

SECTION 8. COMPENSABLE INJURIES. When, because of a compensable injury, it is necessary for an employee to leave his work for medical treatment on the day of injury, he shall be paid for time lost from regular work on the day of his injury while receiving treatment. If the doctor determines that the employee is unable to return to work on the day of his injury, and so notifies the Company in writing, the employee shall be paid for the balance of the shift on which he was injured. Other than entitlement to weekend premium pay, an employee is not entitled to overtime pay

under this provision. If, upon his return to work, the employee has to receive medical treatment due to such injury, and such treatment can only be received during his regular work shift, he shall be paid for time lost while receiving treatment.

SECTION 9. PRINTING OF CONTRACT. The Company shall have the total Agreement printed in booklet form and furnish sufficient copies to the Union and to each employee in the bargaining unit.

SECTION 10. CHANGES OF ADDRESS. It shall be the responsibility of employees to report any change of address or telephone numbers to the Company in writing. The employees shall get a receipt of such notice from the employment office with a duplicate furnished to the Union.

SECTION 11. CREDIT UNION PAYROLL DEDUCTION. The credit union payroll deduction program which was in effect under the prior labor contract will continue during the life of this Agreement.

SECTION 12. MEMORANDUMS OF UNDERSTANDING. During negotiations, which resulted in this labor Agreement, the Union and the Company agreed that the following understanding will prevail during this contract's term.

A.    GROUP LEADERS. A group leader is an hourly payroll employee who is a member of the bargaining unit. He is paid a specified amount of money above the rate of the highest

rated worker in the group he leads. He works at regularly assigned production work, and, in addition, acts as a leader of his group. He may provide personal relief time for the members of the group. A group leader punches the time clock in the same manner as any other employee, and he receives overtime pay for all overtime hours worked. The group leader is not a supervisor.

On shifts where a supervisor is not available and a situation requiring some immediate action or decision outside the authority of a group leader occurs, the group leader present shall contact the supervisor or designated Company representative to determine the action to be followed.

B.    OVERTIME DISTRIBUTION. Overtime will not be required of an employee in accordance with this contract's Article XI, if this would require the employee to work sixteen (16) hours in succession, except on a voluntary basis. In all other situations, the labor Agreement's Article XI will be adhered to when overtime work opportunities are distributed.

C.    INSPECTION DEPARTMENT SENIORITY ADMINISTRATION. Seniority within the Inspection Department will be administered as follows:

1.    The Inspection Department at the plant will operate plantwide. Job classifications within the Inspection Department will be Group Leader and Floor Inspector.

2. For the purpose of training Floor Inspectors to become competent in the inspection of more than one (1) product, Floor Inspectors will be assigned to departments throughout the plant. When they have gained competence in the inspection of other product(s), they will be assigned to departments as work schedules dictate.

3. Job openings for Floor Inspectors will be posted in accordance with Article IX, Section 4 (G) herein.

D. SAFETY INSPECTIONS AND MEETINGS. The Union's designated representative will accompany federal or state safety inspectors on tours of the plant, and will be paid for regular work time missed as a consequence of such inspections.

In addition, the Union Committee's chairman may participate in monthly Union-Management safety meetings and will be paid for regular work time missed as a consequence of such meetings. Participation in monthly Union-Management safety meetings by the Union Committee's chairman will be in addition to participation by the three (3) members of the Safety Committee to which specific reference is made in Section 2 of this contract's Article XVI.

E. UNION ACCOMMODATIONS. The Company will provide a Union office for use by the Union Committee, Stewards, Union President, and Union Vice President. The design and location of such office shall be determined by the Company.

Use of the Union office shall be exclusively for the conduct of Union business. Access to the Union office shall be limited to those Union officials referenced above.

F.  VENDING MACHINE PROCEEDS. Periodically, financial statements reflecting vending machine sales and commissions, if any, will be made available to the Union's financial secretary. Although the Company is willing to consider Union suggestions for disposition of vending machine sales commissions, if any, first priority to such funds will be to underwrite expenses of the annual ham and/or turkey program for all employees of the Holland facilities. Each employee may indicate a preference to receive either a ham or turkey no later than December 1, each year. If no preference is expressed by an employee, the Company shall determine whether a ham or turkey is given that employee.

G.  ANNUAL INVENTORY. Employees that conduct the annual physical inventory will be chosen from the plantwide seniority list. The most-senior employees will be asked to accept such assignments within their department; however, should the number of volunteers be insufficient, the least-senior employees on the plantwide seniority list will be obliged to accept inventory work assignments.

In the event annual physical inventory work is completed prior to the end of the normal work week and production work is not resumed until the following normal work week, inventory workers will be assigned available work which they

can do without regard to traditionally accepted lines of demarcation between the job classifications.

Employees participating in the annual physical inventory shall be paid fifty cents ($.50) per hour above the established hourly pay rate for the Production Helper classification for the time so employed.

H. SUPERVISORS PERFORMING BARGAINING UNIT WORK. Supervisory employees shall not be permitted to perform bargaining unit work except for the following:

    1. In the instruction (including demonstration), or training of employees, provided bargaining unit employees are present.

    2. In product development work, including sample parts to prove any new or altered tooling for the job, provided bargaining unit employees are present.

    3. Establishing necessary experimental operations or pilot productions.

    4. In emergencies, when regular employees are not immediately available (An emergency is defined as a sudden condition beyond the reasonable control of the Company).

I. ONE-DAY VACATION. At the discretion of Management, vacation periods of one (1) day, up to a total of three (3) one-day vacation days per year, may be granted if requested at least three (3) days prior to the day being sought. Approval of the request for vacation time off shall not be

unreasonably withheld; however, refusal to grant one-day vacation requests, which are at the sole discretion of Management, are not subject to the grievance and arbitration provisions of this Agreement.

J. EDUCATIONAL IMPROVEMENT. The Company agrees to reimburse any employee the tuition, or course fee cost, for certain short courses and/or adult education courses successfully completed by the employee, provided the course selected is related to the plant's work activities and is approved by the Company.

SECTION 13. PAYROLL ERROR ADJUSTMENTS. The Company shall make payroll error adjustments, for regular hours worked in a week, within twenty-four (24) hours of notification, if requested. It is understood that such adjustments shall be made only in those cases where the Company erred. Furthermore, it is understood and agreed by the parties that errors for all overtime worked shall be corrected when notified and adjusted in the next payroll processing routine for payment on the next following payday.

SECTION 14. INSURANCE BOOKLETS. The Company and the Union will strive jointly for updated insurance booklets on a regular basis. These booklets will be printed by the insurance carrier for each and all specific benefits and shall be given to all bargaining unit employees as soon as possible after the completion of each series of contract negotiations.

SECTION 15. INSURANCE COST NOTIFICATION. The Company shall annually provide all its bargaining unit employees, upon notification by the insurance carrier of record, of any changes in their cost of continuing medical insurance, life and dependent life insurance, AD&D insurance, and bridge and transition coverage in the event of their layoff from the Company.

## ARTICLE XVII - SKILLED TRADES SUPPLEMENT

SECTION 1. SKILLED TRADES DEFINITION. Skilled Trades Departments, for the purpose of this Agreement, shall mean the Tool and Die, Toolkeeper, Maintenance, Extrusion Die Maker, Extrusion Die Repair, Sample Making and Layout Inspection Departments.

SECTION 2. OCCUPATIONAL SENIORITY. Seniority in the Skilled Trades Departments shall be by occupations or trades within a department. The seniority list shall be by basic classification, except that present employees of such departments shall continue to be listed in the same order shown on seniority lists last published prior to December 5, 1969. Neither this section nor any other section of this Agreement shall be interpreted to mean that the Company shall not have the right of assigning work outside of classification to fill out a Journeyman's time or to answer an emergency.

SECTION 3. FUTURE OCCUPATIONAL SENIORITY. After the signing of this Agreement, seniority of Journeymen in the Skilled Trades Departments shall begin as of date of entry into such department, except graduates of the apprenticeship program; they shall have seniority as provided for in the apprenticeship standards.

SECTION 4. SENIORITY OUTSIDE SKILLED TRADES. Production workers will not carry seniority into the skilled trades occupations; however, skilled trades workers may, in case of layoff, exercise their plant seniority as provided in Article IX of the bargaining Agreement. The decision regarding layoff or exercising plant seniority must be made at the time the reduction in force occurs.

SECTION 5. JOURNEYMAN DEFINITION. The term "journeyman," as used in this Agreement, shall mean any person:

A. Who presently holds a Journeyman classification in the plant in the skilled trades occupations.

B. Who has served a bona fide apprenticeship and has a certificate which substantiates his claim of such service.

C. Who has had eight (8) years of practical experience and can prove same with proper affidavits.

The Company may consider the possession of a UAW Journeyman Card as presumptive proof of qualifications under B and C above.

SECTION 6. FUTURE SKILLED TRADES EMPLOYMENT. Any further employment in the skilled trades occupations in this plant,

after signing of this Agreement, shall be limited to Journeymen, apprentices, or employees in training on non-apprenticeable job classifications.

SECTION 7. LAYOFF AND RECALL. In the case of layoff in the Skilled Trades Departments, the following procedure shall be used:

A. Temporary employees.

B. Probationary Journeymen.

C. Youngest-seniority employee within the occupation.

D. Youngest-seniority employee in the department, providing the employee retained is able to perform the available work.

E. The same procedure shall apply in the Maintenance Department.

F. Recalls shall be made in the reverse order of the layoffs.

SECTION 8. SKILLED TRADES OCCUPATIONS. The following classifications shall be established in the Skilled Trades Departments:

Tool and Die Maker
Maintenance (Electricians and Millwrights)
Extrusion Die Maker (non apprenticeable)
Extrusion Die Repair (non apprenticeable)
Sample Maker (not apprenticeable)
Layout Inspector (not apprenticeable)
Toolkeeper (not apprenticeable)

SECTION 9. APPRENTICESHIP STANDARDS. The Company and the Union have negotiated an apprenticeship program. The apprenticeship

standards are in keeping with the standards of the International Union, UAW. The apprenticeship standards shall be considered as an inseparable part of the supplementary agreement.

SECTION 10. LABOR AGREEMENT APPLICATION. All sections of the bargaining Agreement presently in effect, which are not inconsistent with the supplement, shall apply to the skilled workers.

SECTION 11.

A. When the Company determines it necessary to increase the number of employees in the Extrusion Die Repair, Extrusion Die Maker, Sample Maker and Layout Inspector classifications, such opening(s) shall be filled in the following order of preference:

   1. If any qualified Journeymen have previously been reduced out of the classification to be filled, such employee(s) shall be returned to the classification in accord with the recall provisions of the Agreement.

   2. If no qualified Journeymen are available through the recall procedure, the opening(s) shall be posted for bid by employees of the Company.

B. When an Upgrader Trainee job is to be filled in the Extrusion Die Repair, Extrusion Die Maker, Sample Maker or Layout Inspector classification, bargaining unit employees from other sections of the plant may be transferred to the

appropriate department and reclassified as Upgrader Trainees.

C.  Such transferees shall be given on-the-job experience supplemented with applicable and available outside education to permit them to become proficient in performing the duties of the trade in which the individual is being trained.

D.  Notice of openings for Upgrader Trainees shall be posted on the plant bulletin boards and Upgraders will be selected by the Company on the basis of their overall qualifications, which shall include but not be limited to applicable skills acquired in prior employment, skills acquired during Wickes Manufacturing Company and Hydro Aluminum-Bohn employment and applicable training and education acquired through recognized educational institutions. When qualifications are relatively equal, seniority will prevail.

E.  Should no qualified employee apply for an Upgrader Trainee opening, the Company may hire a suitable qualified person from outside the Company for training under provisions of this Agreement.

F.  Employees who are transferred into or hired into the Upgrader Training Program shall serve a probationary period of ninety (90) days. The probationary period shall not include periods of layoff and/or periods where an employee is transferred back into a non-skilled classification.

G. Upon completion of the upgrading period, such employee shall use his skilled trades seniority (one hundred percent [100%] of his actual training time) for the purpose of layoff and recall.

H. In the event of a curtailment of force in skilled trades classification and/or classifications, such Upgrader and/or Upgraders will be transferred out of the affected classification(s), i.e., Extrusion Die Repair, Extrusion Die Maker, Sample Maker, Layout Inspector, back to their former department and classification in accordance with seniority provisions of this Agreement per Article IX, Section 5. An employee who occupies Upgrader Training status in one (1) of the skilled trade job classifications shall not be permitted to exercise his Upgrader Training seniority against an employee occupying Upgrader Training status in one (1) of the other skilled trade Upgrader job classifications. The Upgraders will exercise seniority in their own Upgrading classification in the event of a reduction of force. The last individual transferred into or hired into an Upgrader classification shall be the first to be transferred out or laid off, as the case may be, i.e., last in, first out.

I. An employee may withdraw from the Upgrader Training Program at any time and return to his former non-skilled classification and department in accordance with his non-skilled trade seniority. The Company may remove an Upgrader

97

Trainee during his probationary period. The Company may remove an Upgrader Trainee who has completed the probationary period from the program for failure to participate in the educational program or for failure to progress toward Journeyman status on the job.

J.  Employees who withdraw from the Upgrader Training Program, or elect to accept a transfer to another classification, or those employees who are removed from the program per paragraph I above, shall be prohibited from reentering an Upgrader Training Program in the same classification, except by mutual agreement of the Company and the Union.

K.  An Upgrader will not be permitted to exercise shift preference over another Upgrader during the Upgrader Training Program and/or Journeymen cannot exercise shift preference over an Upgrader Trainee. Upgraders shall work those shifts which would be most advantageous to their related training. Upon attainment of Journeyman status, employees are subject to shift transfer based on their skilled trades seniority.

L.  The base rate of newly-hired Upgraders, shall be as follows:

| | |
|---|---|
| 1st three (3) months | 70% of Journeyman rate |
| 2nd three (3) months | 75% of Journeyman rate |
| 3rd three (3) months | 80% of Journeyman rate |
| 4th three (3) months | 85% of Journeyman rate |
| Next six (6) months | 90% of Journeyman rate |
| Next six (6) months | 95% of Journeyman rate |
| After two (2) years | Journeyman rate |

Seniority employees who transfer into the Upgrader Program shall enter the program at a base rate of twenty-four cents

($.24) per hour less than the Journeyman rate, and thereafter shall be increased six cents ($.06) per hour for six (6) months until the Journeyman rate is reached. However, employees transferring into the Upgrader Program whose hourly base rate in their former classification is less than twenty-four cents ($.24) per hour below the Journeyman rate shall retain their existing base rate until such time as the six (6) month interval of increases permits a rate adjustment. In no case will an employee, upon transfer into the Upgrader Program, maintain a base rate in excess of the Journeyman rate for the Upgrader classification entered.

The Company will reimburse Upgrader Trainees for required tools not furnished by the Company in an amount not to exceed two hundred dollars ($200), as follows:

A maximum of fifty dollars ($50) shall be provided by the Company at the outset of the training period. A maximum of an additional fifty dollars ($50) shall be provided by the Company after successful completion of the probationary period. A maximum of an additional one hundred dollars ($100) shall be provided by the Company after successful completion of the training program. The Company shall be furnished with receipts to verify expenditure of the above monies for required tools.

M.  The Upgrader Trainee(s) shall be required to sign a statement consenting to the terms and conditions of this Agreement, thereby waiving:

   1.  The right to any permanent status in the Skilled Trades classification other than Upgrader seniority until successful completion of such training period.

N.  It is desirable that Upgraders attain necessary related training to make them competent in as short a period of time as possible.

O.  An Upgrader Trainee shall acquire Journeyman status only after two (2) calendar years in the Upgrader classification and following successful completion of all related classroom instruction.   Further, upon acquiring Journeyman status, overtime hours will be equalized within his own classification.

P.  The Company agrees to pay, on behalf of those employees covered by this Upgrader Program, for books, registration fees, and/or tuition required in connection with related training for a period of not more than three (3) years under this program.   When an Upgrader Trainee is required by the Company to attend classes outside of the normal working hours for the purpose of facilitating training in Extrusion Die Repair, Extrusion Die Maker, CNC Operator and Setup, Sample Maker, or Layout Inspector, the Company will pay the individual his applicable rate of pay including cost-of-living, but excluding shift premium and overtime premium for

the actual hours that an individual participates in classroom instruction. This related training as outlined shall be on a mandatory basis for all future employees entering into this Upgrader Training. In the event an employee fails to achieve a passing grade in a course of related training, the cost of repeating such course of instruction shall be borne by the employee.

Q. The Upgrader Training Program may be amended to include additional training programs by mutual agreement of the Company and the Union.

## ARTICLE XVIII - WORK RELOCATION

Notwithstanding any other provision in this Agreement to the contrary, the Company reserves the right to relocate work when such relocation is determined in its sole judgment to be in the Company's best interest on the basis of sound business practices. Such actions shall not be taken in a capricious or arbitrary manner.

## ARTICLE XIX - TERMINATION AND MODIFICATION

This Agreement will become effective on November 8, 1990, as ratified on December 18, 1990, and shall continue in full force and effect without change until 12:00 midnight November 8, 1993, and thereafter for a successive period of sixty (60) days, unless either party shall, on or before the sixtieth (60th) day prior to expiration, serve written notice on the other party of a desire

to terminate, modify, alter, renegotiate, change, or amend this Agreement. A notice of desire to modify, alter, amend, renegotiate, or change, or any combination thereof, shall have the effect of terminating the entire Agreement (on the expiration date) in the same manner as a notice of desire to terminate, unless before that date all subjects of amendments proposed by either party have been disposed of by agreement or by withdrawal by the party proposing the amendment.

Within ten (10) days after receipt of any such notice, a conference will be arranged to negotiate the proposals, in which case this Agreement shall continue in full force and effect until termination, as provided herein.

Notices shall be sufficient if sent by mail, addressed, if to the Union, to Local Number 1402, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW, Holland Michigan, or to such address as the Union shall furnish to the Company in writing; and, if to the Company, to Hydro Aluminum Bohn, Inc., 365 W. 24th Street, Holland, Michigan, or to such other address as the Company may furnish to the Union in writing.

IN WITNESS WHEREOF, the Company has caused these presents to be signed in its behalf by its duly authorized and accredited representatives; and the Union has caused the same to be signed in its name by its duly authorized and accredited representatives, officers and committeepersons this 11th day of February, 1991:

Article XIX   Continued

Hydro Aluminum Bohn, Inc.
Holland Plant
Holland, Michigan

_Jack Elliott_
Jack Elliott
Attorney-At-Law

_C E Beckham_
C. E. Beckham
Vice President of Operations

_Herman ter Horst_
Herman TerHorst
Operations Manager - Fabrication

_David A. Forbes_
David A. Forbes
Human Resource Manager

International Union, United
Automobile, Aerospace and
Agricultural Implement
Workers of America, UAW,
and Local Number 1402, UAW

_Robert Rietveld_
Robert Rietveld
President

_Don Welch_
Donald Welch
Chairman of Bargaining Committee

_George W. Powell_
George Powell
Committee Person

_Ricardo Marques_
Ricardo Marques
Committee Person

_Ronald Clapp_
Ronald Clapp
Committee Person

_Philip Sullivan_
Philip Sullivan
Committee Person

_Steve Ayers_
Steve Ayers
International Representative

_Paul L. Mastos_
Paul Mastos
Regional Director

Hydro Aluminum Bohn, Inc.
Holland Plant
Holland, Michigan

International Union, United
Automobile, Aerospace and
Agricultural Implement
Workers of America, UAW,
and Local Number 1402, UAW

_____
Jack Elliott
Attorney-At-Law

_____
Robert Rietveld
President

_____
C. E. Beckham
Vice President of Operations

_____
Donald Welch
Chairman of Bargaining Committee

_____
Herman TerHorst
Operations Manager - Fabrication

_____
George Powell
Committee Person

_____
David A. Forbes
Human Resource Manager

_____
Ricardo Marques
Committee Person

_____
Ronald Clapp
Committee Person

_____
Philip Sullivan
Committee Person

_____
Steve Ayers
International Representative

_____
Paul Mastos
Regional Director

## ABSENTEEISM POINT MEMORANDUM OF UNDERSTANDING

The Company agrees upon ratification of the new contract to roll back each employee's absenteeism point total by one (1) point.

_David A. Forbes_
David A. Forbes, Human Resource Manager

## INSURANCE CO-PAYMENT MEMORANDUM OF UNDERSTANDING

The Company herewith agrees that if the amount of money paid by employees into the Company's medical insurance plan as their co-pay contribution exceeds the percentage that they should have paid based upon the actual expenses incurred over the life of this agreement, then any excess funds that are directly attributable to the excess employee co-pay premiums paid into the plan will be remitted to those employees who are on the payroll as of the expiration date of the Contract in a pro-rata amount based upon (1) the coverage selected and paid by the employee (e.g., single, family, etc.) and (2) the number of months the employee was employed during the Contract term. No employee who leaves the employment of the Company prior to the expiration of the Contract, except by reason of layoff during the last year of the Contract, will be eligible for a refund of any excess employee co-payments that may have accrued over the life of the contract.

# HYDRO ALUMINUM-BOHN

## HOLLAND, MICHIGAN

### SHOP RULES

The shop rules set forth below are not intended to be exclusive, are provided for your information and guidance; they are not a part of the Agreement between the Company and the Union. The Union reserves the right to grieve under any circumstance which they consider to be an unreasonable application of any published or unpublished Shop Rule;

THE FOLLOWING OFFENSES ARE VIOLATIONS OF SHOP RULES AND ARE GROUNDS FOR DISCIPLINARY ACTION, INCLUDING DISCHARGE;

1. Leaving job without permission or not reporting to the job on time.

2. Producing excessive scrap or inferior work through carelessness, or willfully wasting or damaging materials or supplies;

3. Theft or attempted theft or removal from the premises without proper authorization any Company property or the property of any employee.

4. Conviction of any felony.

5. False statements on employment application or giving false information at the time of employment as to a pertinent item.

6. Immoral conduct or indecent behavior on Company premises.

7. Fighting or attempting bodily injury to another on Company premises (this does not include action taken in self-defense) or provoking a fight on Company premises.

8. Deliberate falsification of production reports, time reports, or other similar reports.

9. Falsifying information regarding any illness, injury or request for leave of absence of any kind.

10. Intentionally and knowingly punching another employee's time card.

11. Failing to punch in and/or punch out when entering or leaving the plant or when starting or finishing an employee's assigned shift.

12. Misusing, destroying, or damaging Company property or property of any employee.

13. Making of false, vicious, or malicious statements concerning any employee, the Company, or its products.

14. Carrying, possessing or being under the influence of alcohol on Company premises or narcotics at any time, on or off Company premises, or reporting for work while under the influence of alcohol or narcotics.

15. Interfering or refusing to cooperate with the plant protection officers in the performance of their duties.

16. Sleeping on the job during work hours.

17. Insubordination (refusing or failing to obey an order from proper authority).

18. Mistakes due to carelessness.

19. Altering or defacing Company or Union notices on bulletin boards.

20. Distributing written or printed matter of any description in violation of the Company's No Distribution Rule, unless approved by the Human Resource Department; posting or removal of notices or signs, writing or marking on Company property, without authorization from the Company.

21. Creating or contributing to unsanitary conditions or poor housekeeping.

22. Engaging in horseplay, running, scuffling, or throwing things.

23. Gambling or engaging in a lottery on Company premises.

24. Violating a safety rule or safety practice.

25. Failure to observe parking and traffic regulations on Company premises.

26. Failure to carry out a known and specified work procedure. Any instruction to deviate from such procedure must be in written form.

27. Use or possession of another employee's tools without the employee's consent.

28. Engaging in work of a personal nature on Company time and/or property.

29. Soliciting of any kind on Company premises in violation of the Company's No Solicitation Rule.

30. Entering the production area of the plant any time other than regular scheduled work shift unless authorized to do so by the Company.

THE WORK RULES ENUMERATED ABOVE ARE NOT INTENDED TO BE ALL INCLUSIVE, AND OTHER TYPES OF CONDUCT NOT LISTED MAY ALSO BE SUBJECT TO DISCIPLINARY ACTION UP TO AND INCLUDING DISCHARGE.

## NO SOLICITATION/DISTRIBUTION RULE

Many outside organizations have requested permission to solicit our employees for memberships, contributions or participation in various activities. To protect employee rights to privacy and preserve the integrity of the workplace, we have developed uniform policies to deal with these matters. Our solicitation/distribution policies are as follows:

"To avoid interference with the efficiency or safety of employees, solicitation by an employee of another employee on behalf of any cause will not be permitted during work time. work time is all time when an employee is expected to be engaged in work tasks, but does not include lunch periods, break periods and time before and after the employee's scheduled working day. The only exception to this will be company approved programs such as the United Way.

Similarly, to avoid littering or the disruption of work routines, the distribution of literature, products, or other non-business materials will not be permitted in work areas at any time.

Company premises, including parking lots, grounds and buildings, are private property and restricted to use by employees and business visitors. Non-employed visitors must have approved business reason to be permitted on company premises."

# INDEX

Page

Absenteeism and tardiness
Accidental death and dismemberment insurance
Annual inventory

Bereavement pay
Bulletin boards
Bumping

Call back pay
Changes of Address
Compensable injuries
Complete agreement
Contract preemption
Credit union payroll deduction

Dental insurance
Disability placement option
Disciplinary hearings
Disciplinary protests
Discipline and discharge, general
Discipline penalty limit

Educational leaves

Grievance steps
Group leaders

Holiday celebration dates
Holiday pay computation
Holidays and eligibility
Home department recall
Hours of work
Humanitarian placement

Inspection department seniority administration
Insurance coverage dates
Insurance, general

Job posting
Job transfer requests
Journeyman definition
Jury duty

Layoffs
Layoff, temporary
Leaves of absence
Life insurance

111

Index, Continued


Mailing lists
Management rights
Maternity leave
Medical insurance
Medical leave
Memorandums of understanding

New pay rate
Nondiscrimination in Union membership

Off-shift Union plant entry
Other work during leave
Overtime
Overtime equalization
Overtime, notice of
Overtime, pyramiding of
Overtime, Saturday
Overtime, Sunday and Holidays
Overtime work opportunities

Paychecks
Pay rate, production standard and health
     and safety grievances
Pension plan changes
Pension plan, general
Printing of contract
Probationary period
Production standards

Recalls following layoff
Report pay
Representation scope
Retirees, future
Retirees, past
Rule violation penalties

Safety
Seniority, breakoff
Seniority continuation
Seniority coverage
Seniority definitions and application
Seniority, departmental
Seniority lists and Union officer lists
Seniority outside of skilled trade
Seniority, preferential
Seniority upon transfer
Shift designation
Shift preference
Shift premium

112

Index, Continued

Skilled trades, apprenticeship standards
Skilled trades, definition
Skilled trades employment
Skilled trades, labor agreement application
Skilled trades, layoff and recall
Skilled trades, occupational seniority
Skilled trades occupations
Subcontracting
Supervisors seniority bargaining unit work

Termination and modification
Temporary transfer
Transfers
Transition and bridge benefits
Trustee reports

Union accommodations
Union and political leaves
Union bargaining committee
Union membership cessation
Union representation on overtime
Union shop
Union stewards
Union time away from plant
Union time in contract negotiations
Union time, permission for
Unions, other

Vacation pay
Vacation time off
Validity of agreement
Vending machine proceeds

Wage administration
Wages
Weekly sickness and accident benefits
Workforce increases
Workforce reductions