# EXHIBIT 7
## (Part 2)

**1982-1983  UAW - BOHN CONTRACT**

Article XI Cont.

Following is a summary of COLA adjustment
effective dates and three (3) month averages
on which the respective adjustments will be
based and a table of three (3) month average
indexes from which the hourly COLA amount
will be determined and redetermined in
accordance with provisions of this Section 10.

| Three Month Averages BLS Consumer Price Indexes | Cost-of-Living Allowance |
|---|---|
| 189.8-190.0 | 0¢ per hour |
| 190.1-190.3 | 1¢ per hour |
| 190.4-190.6 | 2¢ per hour |
| 190.7-190.9 | 3¢ per hour |
| 191.0-191.2 | 4¢ per hour |
| 191.3-191.5 | 5¢ per hour |
| 191.6-191.8 | 6¢ per hour |
| 191.9-192.1 | 7¢ per hour |
| 192.2-192.4 | 8¢ per hour |
| 192.5-192.7 | 9¢ per hour |
| 192.8-193.0 | 10¢ per hour |
| 193.1-193.3 | 11¢ per hour |
| 193.4-193.6 | 12¢ per hour |
| 193.7-193.9 | 13¢ per hour |
| 194.0-194.2 | 14¢ per hour |
| 194.3-194.5 | 15¢ per hour |
| 194.6-194.8 | 16¢ per hour |
| 194.9-195.1 | 17¢ per hour |

Article XI Cont.

| Three Month Averages BLS Consumer Price Indexes | Cost-of-Living Allowance |
|---|---|
| 195.2-195.4 | 18¢ per hour |
| 195.5-195.7 | 19¢ per hour |
| 195.8-196.0 | 20¢ per hour |
| 196.1-196.3 | 21¢ per hour |
| 196.4-196.6 | 22¢ per hour |
| 196.7-196.9 | 23¢ per hour |
| 197.0-197.2 | 24¢ per hour |
| 197.3-197.5 | 25¢ per hour |
| 197.6-197.8 | 26¢ per hour |
| 197.9-198.1 | 27¢ per hour |
| 198.2-198.4 | 28¢ per hour |
| 198.5-198.7 | 29¢ per hour |
| 198.8-199.0 | 30¢ per hour |
| 199.1-199.3 | 31¢ per hour |
| 199.4-199.6 | 32¢ per hour |
| 199.7-199.9 | 33¢ per hour |
| 200.0-200.2 | 34¢ per hour |
| 200.3-200.5 | 35¢ per hour |
| 200.6-200.8 | 36¢ per hour |
| 200.9-201.1 | 37¢ per hour |
| 201.2-201.4 | 38¢ per hour |

(Etc. in accordance with the formula of one cent (1¢) for each three tenths of one percent (.3 of 1%) change in three (3)-month average indexes.)

Article XI Cont.

| Effective at the Start of the First Pay Period Beginning | Based Upon Changes in Average Indexes Between | |
|---|---|---|
| On or After | Most Recent 3 Months | Preceding 3 Months |
| Sept. 1, 1978 | 5/78, 6/78, 7/78 | 2/78, 3/78, 4/78 |
| Dec. 1, 1978 | 8/78, 9/78, 10/78 | 5/78, 6/78, 7/78 |
| Mar. 1, 1979 | 11/78, 12/78, 1/79 | 8/78, 9/78, 10/78 |
| June 1, 1979 | 2/79, 3/79, 4/79 | 11/78, 12/78, 1/79 |
| Sept. 1, 1979 | 5/79, 6/79, 7/79 | 2/79, 3/79, 4/79 |
| Dec. 1, 1979 | 8/79, 9/79, 10/79 | 5/79, 6/79, 7/79 |
| Mar. 1, 1980 | 11/79, 12/79, 1/80 | 8/79, 9/79, 10/79 |
| June 1, 1980 | 2/80, 3/80, 4/80 | 11/79, 12/79, 1/80 |
| Sept. 1, 1980 | 5/80, 6/80, 7/80 | 2/80, 3/80, 4/80 |
| Dec. 1, 1980 | 8/80, 9/80, 10/80 | 5/80, 6/80, 7/80 |
| Mar. 1, 1981 | 11/80, 12/80, 1/81 | 8/80, 9/80, 10/80 |
| June 1, 1981 | 2/81, 3/81, 4/81 | 11/80, 12/80, 1/81 |

SECTION 11. BEREAVEMENT PAY. When death occurs in an employee's family (i.e., spouse, parent, or step-parent, parent or step-parent of a current spouse, child or step-child, brother, brother-in-law or sister-in-law, step-brother or half-brother, sister, step-sister or half-sister, or grandparents of employee or spouse), the employee, on request, will be excused for any of the first three (3) normally scheduled working days (excluding Saturdays, Sundays and holidays) immediately following the date of death provided he attends the funeral.

Article XI Cont.

An otherwise eligible employee may elect to defer his bereavement leave to any time period within the first (10) consecutive days immediately following the date of death, providing he makes prior arrangements at the Company's Personnel Department. Such deferment of bereavement leave time will not disqualify an otherwise eligible bereavement pay recipient from bereavement pay as hereinbefore provided.

By notifying the Company in advance, an employee may extend a scheduled vacation absence by three (3) days in the event that a qualifying death occurs during his scheduled vacation absence; however, such extension will not serve to qualify such employee for bereavement pay.

In the event a member of the employee's immediate family, as above defined, dies while in the active service of the Armed Forces of the United States, the employee may, should the funeral be delayed, have his excused absence from work delayed until the period of three (3) normally scheduled working days, which includes the date of the funeral. In the event the body of a member of the employee's immediate family, as above defined, is not buried in continental North America solely because the cause of death has physically destroyed the body or the body is donated to an accredited North American hospital or medical center for research purposes, the requirement that the employee attend the funeral will be waived.

An employee excused from work under the above paragraph, shall, after making written

Article XI Cont.

application, receive the amount of wages he would have earned by working during straight time hours on such scheduled days of work which he is excused (excluding) Saturdays, Sundays and holidays, or in the case of employees working in necessary continuous seven (7) day operations, the sixth (6th) and seventh (7th) work days of the employee's scheduled working week and holidays.

Except for employees compensated on group bonus or piece work, payment shall be made at the employee's rate of pay, not including overtime as of his last day worked. For employees on group bonus or piece work, payment shall be made at the employee's average hourly earned rate, not including overtime and night shift premium, for the hours worked during the last pay period in which he is excused. Time thus paid will not be counted as hours worked for purposes of overtime.

SECTION 12. JURY DUTY. An employee with one (1) or more year's seniority who is summoned and reports for jury duty as prescribed by applicable laws shall be paid by the Company an amount equal to the difference between the amount of wages and continuous operations premium the employee otherwise would have earned by working during straight-time hours for the Company on that day – and the daily jury duty fee paid by the court (not including travel allowances or reimbursement of expenses) for each day on which he reports for or performs jury duty and on which he otherwise would have been scheduled to work for the

66

Article XI Cont.

Company. The Company's obligation to pay an employee for jury duty is limited to a maximum of (60) days in any calendar year.

In order to receive payment, an employee must give local Management prior notice that he has been summoned for jury duty and must furnish satisfactory evidence that he reported for or performed jury duty on the days for which he claims such payment. The provisions of this Section are not applicable to an employee who, without being summoned, volunteers for jury duty.

## ARTICLE XII – HOLIDAY PAY

SECTION 1. HOLIDAYS AND ELIGIBILITY.
All hourly-rated employees shall receive holiday pay for Memorial Day, 4th of July, Labor Day, Thanksgiving Day, the day after Thanksgiving Day and the Christmas holiday period, providing:

A. The employee has seniority as of the date of the holiday.

B. The employee would otherwise have been scheduled to work on such day if it had not been a holiday.

C. The employee must have worked the last scheduled work day prior to and the next scheduled work day after such holiday within the employee's scheduled work week; only one (1) work week will be considered. Employees tardy on such last and next scheduled work days shall not lose their holiday pay provided such tardiness does

67

Article XII Cont.

not exceed (25%) of the employee's scheduled
work hours for that day. Employees absent on
such last scheduled work day and next scheduled
work day for reasons of illness must furnish
acceptable proof of illness to the Company's
Medical Department.

SECTION 2. HOLIDAY CELEBRATION DATES.
The dates on which various holidays are cele-
brated during the period commencing 9/3/82
and ending 9/2/83 have been changed to afford
time off between the Christmas and the New
Year's holidays. In the event an otherwise
eligible employee is caused to work on a day
subsequently designated as a celebration day,
he will be eligible for premium pay as prescribed
by this contract; however, in the event an
otherwise eligible employee is caused to work
on a holiday subsequently designated to be
celebrated on another date, he will be paid in
accordance with pay policies established for
work performed on any regular work day during
any regular work week. The following table
reflects those holidays which will be recognized
by the new contract and the specific dates on
which each of the respective holidays will be
celebrated.

Article XII Cont.

## HOLIDAY CELEBRATION DATES
### Between 9/3/82 and 9/2/83

| Contract Holidays | Calendar Year 1982 | Calendar Year 1983 |
|---|---|---|
| Memorial Day | | 5/30 |
| Independence Day | | 7/4 |
| Labor Day | 9/6 | |
| Thanksgiving Day | 11/25 | |
| Day After Thanksgiving | 11/26 | |
| Christmas Holiday Period | 12/24 | |
| | 12/27 | |
| | 12/28 | |
| | 12/30 | |
| | 12/31 | |

It is further agreed that normal operations will be suspended on December 29, 1982.

SECTION 3.  HOLIDAY PAY COMPUTATION. Holiday pay shall be for eight (8) hours at straight time, exclusive of night bonus of overtime.

SECTION 4.  ELIGIBILITY MODIFICATIONS.
A.  Employees with seniority who have been laid off in a reduction of force during the work week prior to or during the week in which the holiday occurs will receive holiday pay.

B.  Employees with seniority who are absent from work during a regularly scheduled work week during which one (1) of the above mentioned holidays falls, due to approved leave of absence or sick leave

69

Article XII Cont.

commencing not more than one (1) week
prior to or terminating not more than
one (1) week after the week in which the
holiday falls, shall receive holiday pay.

C.  When one of the above holidays falls within
an eligible employee's approved vacation
period, and he is absent from work during
his regularly scheduled work week because
of such vacation, he shall be paid for
such holiday.

D.  When a holiday falls on Saturday, eligible
employees shall receive holiday pay, pro-
vided they have worked the full scheduled
shift on the last preceding scheduled work
day within the week in which that holiday
falls.  When a holiday falls on a Sunday,
holiday pay will be given for the following
day if that day is observed by the Federal
Government as a holiday.

E.  Any employee who works on a holiday will
receive holiday pay if otherwise eligible
under the holiday procedure and will also
be paid double his normal straight-time
earnings for such hours worked.

F.  Employees who have accepted holiday work
assignments and failed to report for and
perform such work without reasonable
cause acceptable to Management, shall not
receive holiday pay.

G.  Employees who receive holiday pay under
this procedure and work part of a shift
that falls within the holiday shall receive
straight time for such work on a holiday.

Article XII Cont.

H. For each Christmas Holiday Period (i.e., the holidays scheduled between Christmas and New Year's each calendar year), an employee must work the last scheduled day prior to each holiday period and the next scheduled work day after each holiday period. Failure to work either the last scheduled work day prior to or the next scheduled work day after each holiday period will disqualify the employee from holiday pay for the two (2) holidays immediately succeeding or immediately preceding such scheduled work day.

In order for employees to have maximum time off during the Christmas Holiday Period, employees will only be scheduled for work on the following days which are not paid holidays under this agreement, on a voluntary basis, except in emergency situations.

SCHEDULE OF WEEKEND DAYS
DURING CHRISTMAS SHUTDOWN

| Calendar<br>Year 1982 | Calendar<br>Year 1983 |
|---|---|
| 12/25 | 1/1 |
| 12/26 | 1/2 |

An employee shall not be disqualified for holiday pay if he does not accept work on such days. This does not apply to employees on necessary continuous seven (7) day operations.

I. An employee who commences receiving pension benefits on January 1 and is otherwise

71

Article XII Cont.

   eligible for Christmas·Holiday Period pay
   up to and including December 31, will
   receive such holiday pay.

J.   Employees laid off during the period beginning
     two (2) weeks prior to the Christmas shut-
     down period and ending during the' week
     following the Christmas shutdown period
     will be eligible for Christmas Holiday Period
     pay.

ARTICLE XIII - VACATION PROVISIONS

SECTION 1.   VACATION TIME OFF.   Each employee
who, on January 1, has one (1) or more years
of seniority, shall be entitled to vacation pay
as provided in this Article's Section 2; and, if
such employee has worked (1,040) hours or
more during the (12) consecutive calendar
months immediately preceding his date of hire,
he shall be entitled to time off work in accordance
with the following table.

| Service on Qualifying Date | Time Off |
|---|---|
| One (1) to two (2) years' service | (1) week off |
| Two (2) to eight (8) years' service | (2) weeks off |
| Eight (8) to (15) years' service | (3) weeks off |
| (15) years' service and over | (4) weeks off |

An employee who moves to a new length-of-service
bracket on his anniversary hire date, will be
allowed vacation leave corresponding to the
number of weeks for that particular year that
his new bracket calls for.   For example:   An
employee whose (8th) anniversary hire date

72

Article XIII Cont.

falls on September 1 is entitled to two (2) weeks
vacation time off prior to September 1. After
September 1, he would be eligible for an addi-
tional one (1) week for a total of three (3)
weeks in that calendar year.

Requests for vacation time off must be made and
approved by the Company and the Union at
least four (4) weeks in advance, and the Company
reserves the right to limit the number of leaves
in any department at one time to not more than
(15%) of the number of employees in that
department. Requests for vacation time off
which are submitted at least one (1) week in
advance will be given consideration provided
the granting of such request will not result in
exceeding the (15%) limit as set forth above.

Vacations will be allocated by seniority, except
in those cases where such allocation would
result in too many employees in the same
classification being off, in which event the
Company will retain the necessary employees
to maintain the operation.

Time lost on account of industrial accidents or
occupational disease, as well as time lost away
from the plant by Union Representatives on
official Union business, shall be counted as
time worked for the purpose of this Section.

Vacation time unused in any calendar year
shall be of no value or credit in any other
year, except for one (1) week, which may
be banked.

Article XIII Cont.

SECTION 2.  VACATION PAY.

A.  Vacation pay will be computed in accordance
with the following:

| Seniority on December 31 | % of All Earnings Except Vacation Pay During the Calendar Year |
|---|---|
| One (1) year but less than three (3) years | $3\frac{1}{2}$% |
| Three (3) years but less than five (5) years | $4\frac{1}{2}$% |
| Five (5) years but less than (10) years | 6% |
| (10) years but less than (15) years | 7% |
| (15) years but less than (20) years | 8% |
| (20) years or over | $8\frac{1}{2}$% |

B.  Employees who quit or are discharged shall
receive their vacation bonus provided they
have accumulated one (1) or more years'
seniority at the date of quitting.

C.  Employees who retire under the terms of
Article XIV of this agreement will receive
vacation bonus for the portion of the year
during which they were active employees
but will not be entitled to any vacation
bonus for any period after the date of
retirement.

74

Article XIII Cont.

D. The vacation bonus will be paid no later
than the pay period immediately preceding
February 15, each year during the life
of this agreement.

## ARTICLE XIV- PENSION PLAN

SECTION 1. GENERAL. Although reflected in
separate document, the pension plan which was
in effect during the life of the contract that
expired on September 2, 1982, will continue as
part of this labor agreement and will continue
in effect during the new contract's life at
Company expense. In addition, the improve-
ments described in subsequent sections of this
Article will be placed into effect on the dates
indicated at Company expense and will be
reflected in the pension plan's text.

SECTION 2. FUTURE RETIREES. The basic
benefit level per month per year of credited
service for otherwise eligible employees who
retire under the pension plan's normal, early,
disability or vested deferred provisions on or
after October 1, 1978, will be $9.00 per month
per year of credited service $9.50 per month
per year of credited service on and after
October 1, 1979; and $10.00 per month per year
of credited service on and after October 1, 1980.
Applicable actuarial reduction formulas specified
within the pension plan will continue in effect.
The benefit level per month per year of credited
service in effect at the time a vested employee's
service terminates will continue to be the basis
for determining the monthly benefit amount when
he is eligible to receive such benefits.

75

Article XIV Cont.

SECTION 3. PAST RETIREES AND WIDOW
SURVIVORS. On and after October 1, 1978,
the pension benefit of former employees, and
widow survivors of former employees, who
retired under the normal, early, vested
deferred, or disability features of the pension
plan prior to 10/1/78 will be increased (50¢)
per month per year of credited service.

On and after October 1, 1978, the pension
benefit of former employees, and widow sur-
vivors of former employees, who retired under
the normal, early, vested deferred, or dis-
ability features of the pension plan prior to
10/1/78 will be increased by (50¢) per month
per year of credited service in effect at the
time a vested employee's service terminates
will continue to be the basis for determining
the monthly benefit amount when he is eligible
to receive such benefits.

SECTION 4. OTHER PENSION PLAN CHANGES.

A. MILITARY CREDITED SERVICE. Pursuant
to the Selective Service Act, an employee
who left or leaves the Company's employ and
who returned or returns to the Company's
employ will be credited with pension plan
credited service lost while serving in the
military of the United States government;
however, in no case will the reinstatement
of such credits serve to afford more pension
plan credited service than such employee
would have earned as a full-time employee
of the Company during the time he served
in the military.

76

Article XIV Cont.

B. EARLY RETIREMENT AGE. An otherwise
   eligible employee may continue to retire at
   age (55); however, the pension plan's
   early retirement reduction formula will apply
   to the applicable basic benefit level per
   month per year of credited service.

C. SURVIVOR'S OPTION ELIGIBILITY. The
   survivor's option feature will apply to an
   otherwise eligible employee, including a
   disability retiree, at age (55).

D. PENSION BOARD MEMBER INSURANCE
   EXPENSE. Any insurance expense for joint
   Pension Board members which the ERISA
   Law may require will be paid by the Company.

E. ERISA EFFECTS UPON PENSION PLAN. Any
   changes to the pension plan required by
   the ERISA Law will not reduce negotiated
   pension benefits.

F. WORKMEN'S COMPENSATION OFFSET TO
   PENSION BENEFITS. By way of further
   clarifying this feature of the pension plan,
   the following language has been added.
   "The monthly pension benefit of an other-
   wise eligible retiree will be reduced by
   (50%) of any Workmen's Compensation bene-
   fits he receives if application for Workmen's
   Compensation benefits is made when such
   retiree is between the ages of (65) and (67).
   The monthly pension benefit of an otherwise
   eligible retiree will be reduced by (100%) of
   any Workmen's Compensation benefits he
   receives if application for Workmen's Compen-
   sation benefits is made when such retiree is
   age (67) or older."

77

Article XIV Cont.

G. PENSION BOOKLETS. Subsequent to
including ERISA Law-mandated changes
in the pension plan, the complete plan
text will be printed, reproduced in
sufficient quantity, and distributed to
all employees covered by this agreement.

H. Effective January 1, 1979, employees
whose effective date of retirement is on
or after January 1, 1979, and whose
total years of credited service is (30) or
more, and whose age at date of retirement
is at least (55) years, but less than (62),
shall receive the basic benefit payable
under the plan plus a supplemental benefit,
the sum of which shall equal ($500.00) per
month. Payment of the supplemental
benefit to a retiree under this provision
shall cease on the retiree's (62nd) birthday.

I. Effective October 1, 1978, the widow
survivor benefit shall be increased from
(55%) to (60%) for employees retiring on
or after October 1, 1978.

J. Pension benefit improvements which become
effective with the signing of this agreement
shall be funded over a period of (30) years
or less.

K. Effective October 1, 1978, the Company
will contribute ($8.20) per month toward
the cost of Medicare coverage for eligible
retirees and widow survivors.

L. Upon receipt of a duly signed check-off
authorization, the Company agrees to

Article XIV Cont.

     withhold a maximum of ($1.00) per month
from the pension benefit of eligible
retirees. Such monies are to be paid
to the Local Union as monthly dues.

M.  All provisions of the present pension plan
not modified above will remain as at present.

## ARTICLE XV – INSURANCE

SECTION 1. GENERAL. Life, accidental
death and dismemberment, transition and
bridge, weekly indemnity, and medical insurance
coverages (i.e., hospitalization and surgical)
for active and inactive payroll employees which
were in effect during the life of the contract
that expired on September 2, 1982, will con-
tinue in effect during the new agreement's
life at Company expense. In addition, the
improvements to which this Article makes
reference will be placed into effect on the
dates indicated at Company expense. Policies
regarding eligibility for coverage and coverage
effective dates which prevailed during the life
of the contract that expired September 2, 1982,
and which are unchanged by this Article, will
continue in effect during this labor agreement's
life.

SUMMARY OF BENEFITS IN EFFECT 9/2/78

| Benefits | Benefit Amounts |
|---|---|
| Life Insurance for active payroll employees | $11,000 |

Article XV Cont.

| Benefits | Benefit Amounts |
|---|---|
| Dependent Life Insurance | |
| Spouse | $ 1,000 |
| Dependent Children between the ages of six months and (19) years | $ 1,000 |
| Dependent Children between the ages of five days and six months | $ 100 |
| Life Insurance for Pension Plan Retirees | $ 1,000 |
| Accidental death and dismemberment insurance for active payroll employees | $ 9,000 |
| Survivor income benefit insurance | |
| Transition (24 months) | $ 150/month |
| Bridge | $ 150/month |
| Weekly sickness and accident benefits for employees (Commencing the first day of an accident and the fourth day of a sickness for a maximum period of 26 weeks; six-week maternity benefit) | $ 90/week |

Medical insurance (employee and dependents):

Michigan Blue Cross/Blue Shield MV-2
Ward Program, including the following
riders:  D45NM – ML – IMB – OPC –
CC – DCCR – $2.00 Co-pay Drug –
XF for retirees – FAE-VST – Reciprocity

Article XV Cont.

SECTION 2. LIFE INSURANCE. Effective
October 1, 1978, the insurance coverage for
otherwise eligible active payroll employees
will be increased from ($11,000) to ($12,000).
Effective October 1, 1979, life insurance
coverage for otherwise eligible active payroll
employees will be increased from ($12,000) to
($13,000).

SECTION 3. ACCIDENTAL DEATH & DISMEM-
BERMENT INSURANCE. Effective October 1,
1978, accidental death and dismemberment
insurance for otherwise eligible active payroll
employees will be increased from ($9,000) to
($11,000).

SECTION 4. TRANSITION AND BRIDGE
BENEFITS.

A. BENEFIT CHANGES. Effective October 1,
   1978, the monthly benefit under the
   transition and bridge program will be
   increased from ($150) to ($175). This
   improvement will apply to claims initiated
   by eligible survivors based on qualifying
   deaths which occur on and after October 1,
   1978.

B. TRANSITION BENEFITS-ELIGIBILITY.
   The transition benefit monthly payment
   will commence on the first day of the
   month following your death. This payment
   will continue for (24) months or until you
   are not survived by anyone who qualifies
   as an eligible survivor, whichever occurs
   first.

81

Article XV Cont.

The transition benefit will be paid in order of priority to:

1. Your widow or widower, if she or he was lawfully married to you for at least one (1) year immediately prior to your death.

2. Your unmarried child or children under (21) years of age at the time each monthly benefit becomes payable.

3. Your parent or parents for whom you provided at least (50%) support during the calendar year preceding the year in which your death occurred or you became continuously disabled until death.

(Since more than one individual may qualify under 2 and 3 above, the monthly benefit will be divided equally among the survivors.)

C. BRIDGE BENEFIT ELIGIBILITY. The bridge benefit is payable to your widow or widower in the form of monthly income benefits and will begin on the first day of the month following receipt of the last transition benefit payment. Your spouse must have been at least (48) but under (60) years of age at the time of your death, and not re-married at the time this benefit commences. Also, if your spouse receives Social Security benefits for your dependent children, the bridge benefit will not become payable until the Social Security benefits cease.

Article XV Cont.

The bridge benefit will terminate when your spouse:

1. Remarries.

2. Attains age (62) or any younger age at which full widow or widower's insurance benefits are payable under the Federal Social Security Act.

3. Ceases to qualify as an eligible survivor.

4. Dies.

D. TRANSITION & BRIDGE DISABILITY BENEFIT. In case of total disability while insured, your survivor income benefit insurance will be continued without further cost for as long as you remain totally disabled, if:

1. The disability starts before your (60th) birthday, and, in all probability, you will be unable to engage in any work for an extended period of time, and

2. At the time you become so disabled, you have an eligible survivor.

SECTION 5. WEEKLY SICKNESS AND ACCIDENT BENEFITS.

A. WEEKLY BENEFIT LEVEL IMPROVEMENTS. For new claims originating on and after October 1, 1978, the weekly benefit level will be increased from ($90.00) to ($100.00). For new claims originating on and after October 1, 1979, the weekly benefit level will be increased from ($100.00) to ($105.00).

Article XV Cont.

For new claims originating on and after October 1, 1980, the weekly benefit level will be increased from ($105.00) to ($110.00).

B. WEEKLY S&A BENEFITS AND DISPUTED WORKMEN'S COMPENSATION CLAIMS. Weekly sickness and accident benefits will be payable to a Workmen's Compensation claimant whose disabling circumstances commence on and after October 1, 1978, as hereafter provided. Subject to the completion of a reimbursement agreement form provided by the Company, disability advances shall be paid to a claimant for weekly sickness and accident benefits who has alleged that the disabling circumstance is work-related when the Company does not voluntarily accept liability under existing Workmen's compensation laws, providing medical evidence of total and continuous disability satisfactory to the insurance carrier is submitted. Such payments will cease should the Company's insurance carrier subsequently determine that a claimant is not eligible for weekly sickness and accident benefits.

In the event it is subsequently determined that weekly sickness and accident benefits remitted in this circumstance should not have been paid and/or should have been paid in a lesser amount, written notice shall be given to the claimant, and he shall repay the entire amount or the amount of overpayment to the insurance carrier. If the claimant fails to repay promptly, the insurance carrier shall recover the amount due and owing by

Article XV Cont.

making an appropriate deduction or deductions from any future benefit payment or payments payable to the employee under the group insurance program, or may cause the Company to make the appropriate deductions from future compensation payable by the Company to the claimant.

C. WEEKLY S&A DURING MATERNITY LEAVE. The Company agrees to indemnify Local #1402 and the International Union against possible liability in a suit seeking to require the inclusion of maternity benefits in sickness and accident insurance coverage to a greater extent than the current program provides. The Company agrees to comply with final litigation in this regard.

SECTION 6. MEDICAL INSURANCE.

A. B-77 PROGRAM. Effective October 1, 1978, eligible employees and their dependents will be covered by the Michigan Blue Cross-Blue Shield B-77 Program, including the FAE-VST-Reciprocity rider. The cost of such coverage is to be borne by the Company.

B. RETIREE DRUG COVERAGE. Effective on and after October 1, 1978, coverage under the currently in-effect medical insurance program's $2.00 Co-pay Drug Rider for retirees under the pension plan, which is a part of this agreement, will continue to be fully paid by the Company.

Article XV Cont.

C. MASTER MEDICAL PROGRAM. Effective
October 1, 1978, eligible employees and
their dependents will be covered by the
Michigan Blue Cross-Blue Shield 80/20
Co-pay Master Medical program. Deductibles
under this plan shall be ($100.00) individual
and ($200) family. The cost of such
coverages is to be borne by the Company.

SECTION 7. DENTAL INSURANCE COVERAGE.

Effective on and after September 3, 1978, eligible
employees and their covered dependents will
continue to be provided dental program insurance
coverage at Company expense. Coverage effective
dates will be as per this Article's Section 8.

SECTION 8. INSURANCE COVERAGE EFFECTIVE
DATES.

A. Group insurance coverages (i.e., life, AD&D,
dependent life, transition and bridge, weekly
sickness and accident) and medical insurance
coverages for a new hire or a rehired
employee will become effective on the 31st
day of employment, providing such employee
is on the active payroll on such day.

B. For an employee reinstated from the inactive
to the active payroll, group and medical
insurance coverages provided by this agree-
ment will become effective on the effective
date of placement onto the active payroll.

C. Except for Company-paid group and medical
insurance coverages hereinbefore specified
for employees who retire under this agree-
ment's pension plan, all Company-paid group
and medical insurance coverages will cease

Article XV Cont.

on the first (1st) day immediately following termination of seniority.

D. Company-paid group and medical insurance coverages for inactive payroll employees will be continued in accordance with the following:

1. Life, dependent life, AD&D, transition and bridge, and medical insurance coverages will be afforded to employees who become inactive by reason of layoff, vacation leave, personal leave, or any other approved leave for two (2) calendar months following the month in which such leaves commence.

2. Life, dependent life, AD&D, transition and bridge, and medical insurance coverages will be afforded to employees who become inactive by reason of an approved sick, industrial injury and/or sickness, or maternity leave for six (6) calendar months immediately following the month in which such approved leaves commence.

E. An employee who becomes inactive by reason of layoff and/or an approved leave may purchase medical insurance coverage for one (1) year immediately following the last month for which the Company remits insurance premiums in behalf of the inactive employee by making advance payments to the Company's Personnel Office.

F. An employee who becomes inactive by reason

87

Article XV Cont.

> of an industrial illness shall continue to
> be provided with coverages for life,
> dependent life, AD&D, transition and
> bridge, and medical insurance for a
> period not to exceed two (2) years.
> Cost of such coverages will be fully
> paid by the Company.

SECTION 9. INSURANCE HIGHLIGHT BOOKLETS.
Descriptions of benefits and eligibility require-
ments which prevailed during the immediately
preceding labor agreement's term and improve-
ments to which reference is herein made will
be reflected in insurance highlight booklets
which the Company will request the respective
carriers to provide covered employees.

## ARTICLE XVI - GENERAL

SECTION 1. BULLETIN BOARDS. The Company
shall permit the use by the Union of sufficient
space on the Company's bulletin board for the
posting of notices restricted as follows:

A. Notices of Union recreational and social
affairs.

B. Notice of Union elections, appointments,
and results of Union elections pertaining
to the plant or department involved.

C. Notice of Union meetings.

All such notices must be submitted to the Company
for approval before posting.

SECTION 2. SAFETY. The Company shall
continue to make reasonable provisions for the

Article XVI Cont.

safety and health of its employees during the hours of their employment, as it has prior to the signing of this agreement through the maintenance of its protective devices and equipment in accordance with the requirements of the State law.

In order to carry out the intent of this Section, the Union shall appoint two (2) of its members who are employed at Plant #16 and one (1) of its members who is employed at Plant #19 to serve on the Safety Committee. The Safety Committee shall meet at least once each month. Special meetings may be held when conditions warrant. Unsafe conditions shall be reported first to the supervisor of the area.

SECTION 3. CONTRACT PRE-EMPTION. Any agreement made by representatives of either party which is not consistent with the terms of this contract shall be of no force and effect.

SECTION 4. VALIDITY OF AGREEMENT. This agreement supersedes all prior agreements and understandings, oral or written, except as they are expressly reaffirmed or incorporated herein. Should any term or terms of this agreement be or become wholly or partly in conflict with the laws existing during the term of this agreement, the validity of the balance of this agreement shall in no way be affected, and this agreement shall be deemed modified to conform to the provisions of said existing laws.

SECTION 5. COMPLETE AGREEMENT. The parties acknowledge that during the negotiations which resulted in this agreement, each had the

89

Article XVI Cont.

unlimited right and opportunity to make demands
and proposals with respect to any subject or
matter not removed by law from the area of
collective bargaining, and that the understand-
ings and agreements arrived at by the parties
after the exercise of that right and opportunity
are set forth in this agreement. Therefore the
Company and the Union, for the life of this
agreement, each voluntarily and unqualifiedly
waives the right, and each agrees that the other
shall not be obligated, to bargain collectively
with respect to any subject or matter referred
to or covered in this agreement or with respect
to any subject or matter not specifically referred
to or covered in this agreement, even though
such subject or matter may not have been within
the knowledge or contemplation of either or both
of the parties at the time that they negotiated
or signed this agreement.

SECTION 6. TRUSTEE REPORTS. Copies of
all Trustees' reports of all benefit plans shall
be provided to the International Union, U.A.W.,
Solidarity House, Detroit, Michigan (8000 East
Jefferson Avenue), and to the Regional Director,
1-D, Box H, Grand Rapids, Michigan 49501.

SECTION 7. MAILING LISTS. Within (30) days
after the ratification of this agreement and every
six (6) months thereafter during the term of
this agreement, the Company shall give to the
International Union the names of all retirees, as
well as employees covered by this agreement,
together with their addresses and Social Security
numbers as they appear on the records of the
Company. The International Union shall receive
and retain such information in confidence and
shall disclose it only to those officials of the

90

Article XVI Cont.

Union whose duties require them to have such information.

SECTION 8. COMPENSABLE INJURIES. When, because of a compensable injury, it is necessary for an employee to leave his work for medical treatment on the day of injury, he shall be paid for time lost from regular work while receiving treatment. If the doctor finds that the employee is unable to return to work on the day of injury, the employee shall be paid for the balance of the shift on which he was injured. If, upon his return to work, the employee has to receive medical treatment due to such injury, and such treatment can only be received during his regular work shift, he shall be paid for time lost while receiving treatment.

SECTION 9. PRINTING OF CONTRACT. The Company shall have the total agreement printed in booklet form and furnish sufficient copies to the Union and to each employee in the bargaining unit.

SECTION 10. CHANGES OF ADDRESS. It shall be the responsibility of employees to report any change of address or telephone numbers to the Company in writing. The employees shall get a receipt of such notice from the employment office with a duplicate furnished to the Union.

SECTION 11. CREDIT UNION PAYROLL DEDUCTION. The credit union payroll deduction program, which was in effect under the prior labor contract, will continue during the life of this agreement.

Article XVI Cont.

SECTION 12. MEMORANDUMS OF UNDERSTAND-
ING. During negotiations, which resulted in
this labor agreement, the Union and the Company
agreed that the following memorandums of under-
standing will prevail during this contract's term.

A. GROUP LEADERS. A group leader is an
hourly payroll employee who is a member
of the bargaining unit. He is normally paid
a certain amount of money above the rate
of highest rated worker in the group that
he is the leader of. He works at regularly
assigned production work, and, in addition,
acts as a leader of his group. He may
provide personal relief time for the members
of the group. A group leader punches the
time clock in the same manner as any other
employee, and he receives overtime pay
for all overtime hours worked.

The group leader is not a foreman. He
receives his orders and work schedules
from a supervisor or foreman. and then
acts as a conduit to pass the supervisor's
order on to the work crew. He carries
out set instructions of the supervisor.

The group leader will assign work within
the group in accordance with the super-
visor's instructions and the work schedule
of jobs or parts to be produced.

The group leader will give necessary
instructions to employees in performance
of their work to insure an even flow of
production in the department.

## Article XVI Cont.

In case of failure on the part of an employee
to do a job properly, he shall explain how
the job should be done and why it should
be done that way.  A group leader is not
to report rule violations to the foreman
for the purpose of causing Management
to impose discipline on an employee or
group of employees.  It will be expected
that violations affecting the safety of other
employees or the worker involved will be
referred to the steward and supervision.

He does not attend supervisory meetings
and does not have the privileges reserved
for supervisors or foremen.

Supervisors are not to perform production
work; however, the group leader devotes
a substantial part of his work hours
performing the same type of work that his
group performs.

The group leader makes routine reports
to his supervisor concerning the flow of
work and conditions encountered by the
group, but he has no authority to hire,
transfer, suspend, lay off, recall, promote,
discharge, reward or discipline other
employees, or to adjust their grievances,
or to effectively recommend such action.

On shifts where a foreman is not available
and a situation requiring some immediate
action or decision outside the authority of
a group leader occurs, the group leader
present shall contact the foreman or
designated Company representative to
determine the action to be followed.

Article XVI Cont.

B. SAW SHARPENER-CANISTER MAKER JOB
CLASSIFICATION. The job incumbent of
the job classification "Saw Sharpener-
Canister Maker" will not be bumped by
employees on other shifts for shift
preference.

In the event of layoff, a maintenance man
with greater seniority and present ability
to perform the work may displace the
holder of the "Saw Sharpener-Canister
Maker" classification at the rate of the job.
Such layoff will not be considered as
permanent vacating of the classification.

During periods when the Saw Sharpener-
Canister Maker does not have full-time
work in his classification, he shall work
with maintenance men in accordance with
past practice.

It is understood that the employee classified
as "Saw Sharpener-Canister Maker" will
not share in daily, weekend or holiday
overtime opportunities for maintenance men,
unless all maintenance men are scheduled
for overtime work at the same time, and
there is miscellaneous maintenance fill-in
work which the Saw Sharpener-Canister
Maker might perform by way of assisting
maintenance employees.

The employee classified as "Saw Sharpener-
Canister Maker" will be afforded any over-
time work within his job classification.

This new classification shall only exist

Article XVI Cont.

until the employee now doing this work
permanently vacates it. At such time, the
parties will renegotiate this classification
with appropriate job content and rate.

C.  OVERTIME DISTRIBUTION. Overtime will
not be offered to an employee in accordance
with the contract's Article 11, if this would
require the employee to work (16) hours in
succession, except on a voluntary basis.
In all other situations, the labor agreement's
Article 11 will be adhered to when overtime
work opportunities are distributed.

D.  INSPECTION DEPARTMENT SENIORITY
ADMINISTRATION. Seniority within the
Inspection Department will continue to be
administered as follows:

1.  The Inspection Department at each of
the two (2) plants (#16 and #19) will
operate plant-wide within each plant.
Job classifications within the inspection
Department at each plant will be Group
Leader and Floor Inspector.

2.  For the purpose of training Floor
Inspectors to become competent in the
inspection of more than one (1) product,
Floor Inspectors will be assigned to
departments other than their "Home"
department. When they have gained
competence in the inspection of other
product(s), they will be allowed to
transfer back to their "Home" depart-
ment and be assigned to other depart-
ments only to maintain their competence
or as work schedules dictate.

95

Article XVI Cont.

3. Job openings for floor inspectors will be posted plant-wide.

4. In the event of a department layoff, an inspector may apply his seniority to claim an open job for which he is qualified, or, if no such job exists, he may claim any non-posted job held by a junior employee.

E. SAFETY INSPECTIONS & MEETINGS. The Union Committee's chairman may accompany Federal or State safety inspectors on tours of the Holland plants, and he will be paid for regular work time missed as a consequence of such inspections.

In addition, the Union Committee's chairman may participate in monthly Union-Management safety meetings and will be paid for regular work time missed as a consequence of such meetings. Participation in monthly Union-Management safety meetings by the Union Committees; chairman will be in addition to participation by the three (3) members of the Safety Committee to which specific reference is made in Section 2 of this contract's Article XVI.

F. UNION ACCOMMODATIONS. The Company will provide a stand-up desk and a file cabinet which may be locked; for use by the Union Committee in the conduct of Union business at Plant 19.

The Company will further provide at Plant 16 a Union office for use by the Union Committee, Stewards, the Union President

Article XVI Cont.

and Union Vice President. The design and
location of such office shall be determined
by the Company. Use of the Union office
shall be exclusively for the conduct of
Union business. Access to the Union office
shall be limited to those Union officials
referenced above.

G. VENDING MACHINE PROCEEDS. Periodi-
cally, financial statements reflecting vend-
ing machine sales and commissions, if any,
will be made available to the Union's
financial secretary. Although the Company
is willing to consider Union suggestions for
disposition of vending machine sales
commissions, if any, first priority for such
funds will be to underwrite expenses of
the annual ham and/or turkey program
for all employees of the Holland facilities.

H. ANNUAL INVENTORY. Employees to conduct
the annual physical inventory will be chosen
from the plant-wide seniority list. The most
senior employees will be asked to accept
such assignments within his/her plant; how-
ever, should the number of volunteers be
insufficient, the least-senior employees on
the plantwide seniority list will be obliged
to accept inventory work assignments.

In the event annual physical inventory work
is completed prior to the end of the normal
work week and production work is not
resumed until the following normal work
week, inventory workers will be assigned
available work which they can do without
regard to traditionally accepted lines of
demarcation between the job classifications.

97

Article XVI Cont.

If the annual physical inventory is conducted on Saturday or Sunday, it will be done by utilizing the Plant-Wide Overtime Volunteer List, in accordance with the provisions of Article XI, Section 1, on Overtime.

Employees participating in the annual physical inventory shall be paid (50¢) per hour above the established hourly pay rate for the "Production Helper" classification for the time so employed.

## ARTICLE XVII –
## SKILLED TRADES SUPPLEMENT

SECTION 1. SKILLED TRADES DEFINITION. Skilled Trades departments, for the purpose of this agreement, shall mean the Tool and Die Department, the Maintenance Department, and the Extrusion Die Repair.

SECTION 2. OCCUPATIONAL SENIORITY. Seniority in the Skilled Trades Departments shall be by occupations or trades within a department. The seniority list shall be by basic classification, except that present employees of such departments shall continue to be listed in the same order shown on seniority lists last published prior to December 5, 1969. Neither this section nor any other section of this agreement shall be interpreted to mean that the Company shall not have the right of assigning work outside of classification to fill out a Journeyman's time or to answer an emergency.

The Skilled Departments of the two plants shall remain separate and apart, except that Plant Seniority, as herein defined, may, because of a reduction in work, result in the assignment

Article XVII Cont.

of Skilled employees from one plant to the
Skilled Departments of the other plant. Further-
more, the Company reserves the right to
temporarily assign Skilled employees of either
plant to the Skilled Departments of the other
plant as the need arises, such assignment to
be made with proper regard for the provisions
of the Skilled Trades Agreement.

Journeymen Skilled Trades employees shall be
permitted to exercise seniority to displace (bump)
a less senior Journeyman to achieve an interplant
transfer within the same classification. The
exercise of a bump to accomplish such interplant
transfer shall be limited to a maximum of one (1)
bump in any six (6) month period within a
classification from Plant 16 to Plant 19, and
likewise, a maximum of one (1) bump in any six
(6) month period within a classification from
Plant 19 to Plant 16. A Skilled Trades employee
who exercises seniority to move from one plant
to another by transfer or bump, shall not there-
after be entitled to an interplant transfer or
bump during the following (12) calendar month
period.

SECTION 3. FUTURE OCCUPATIONAL SENIORITY.
After the signing of this agreement, seniority of
Journeymen in the Skilled Trades Departments
shall begin as of date of entry into such depart-
ment, except graduates of the apprenticeship
program; they shall have seniority as provided
for in the apprenticeship standards.

SECTION 4. SENIORITY OUTSIDE SKILLED
TRADES. Production workers will not carry
seniority into the Skilled Trades occupations;

99

ARTICLE XVII Cont.

however, Skilled Trades workers who were
formerly employed as production workers at
either Plant 16 or Plant 19, may, in case of
layoff, exercise their plant seniority as pro-
vided in Article IX of the bargaining agreement.
Skilled Trades workers who were hired directly
into a Skilled Trades occupation shall not be
permitted to exercise plant seniority to transfer
to a production worker classification, except
by mutual agreement of the Company and the
Union.

SECTION 5. "JOURNEYMAN" DEFINITION.
The term "Journeyman", as used in this agree-
ment, shall mean any person:

A. Who presently holds a Journeyman classi-
   fication in the plant in the Skilled Trades
   occupations.

B. Who has served a bona fide apprenticeship
   and has a certificate which substantiates
   his claim of such service.

C. Who has had eight (8) years of practical
   experience and can prove same with
   proper affidavits.

   The Company may consider the possession
   of a U.A.W. Journeyman Card as presumptive
   proof of qualifications under B and C above.

SECTION 6. FUTURE SKILLED TRADES EMPLOY-
MENT. Any further employment in the Skilled
Trades occupations in these plants, after
signing of the agreement, shall be limited to
Journeymen, Apprentices, or employees in
training on non-apprenticeable job classifica-
tions.

. 100

Article XVII Cont.

SECTION 7. LAYOFF & RECALL. In the case of layoff in the Skilled Trades Department, the following procedure shall be used:

A. Temporary employees.

B. Probationary Journeymen.

C. Youngest seniority employee within the occupation.

D. Youngest seniority employee in the department, providing the employee retained is able to perform the available work.

E. The same procedure shall apply in the Maintenance Department.

F. Recalls shall be made in the reverse order of the layoffs.

SECTION 8. SKILLED TRADES OCCUPATIONS. The following classifications shall be established in the Skilled Trades Departments:

Tool & Die Maker

Electrician

Welder Maintenance (not apprenticeable)

Millwright

Extrusion Die Repair (not apprenticeable)

Saw Sharpener–Canister Maker (not apprenticeable)

Sample Maker (not apprenticeable)

Layout Inspector (not apprenticeable)

Article XVII Cont.

SECTION 9.  APPRENTICESHIP STANDARDS.
The Company and the Union have negotiated
an apprenticeship program.  The apprentice-
ship standards are in keeping with the standards
of the International Union, U.A.W.  The
apprenticeship standards shall be considered
as an inseparable part of the supplementary
agreement.

SECTION 10.  LABOR AGREEMENT APPLICATION.
All sections of the bargaining agreement
presently in effect, which are not inconsistent
with the supplement, shall apply to the Skilled
workers.

SECTION 11.

A.  When the Company determines it necessary
to increase the number of employees in the
Extrusion Die Repair, Sample Maker and
Layout Inspector classifications, such
opening(s) shall be filled in the following
order of preference.

1.  If any qualified Journeymen have
previously been reduced out of the
classification to be filled, such
employee(s) shall be returned to the
classification in accord with the re-
call provisions of the agreement.

2.  If no qualified Journeymen are available
through the recall procedure, the
opening(s) shall be posted for bid by
employees of the Company.

Article XVII Cont.

B. When an Upgrader Trainee job is to be filled in the Extrusion Die Repair, Sample Maker or Layout Inspector classification, bargaining unit employees from other sections of the plant may be transferred to the appropriate department and re-classified as Upgrader Trainees.

C. Such transferees shall be given on-the-job experience supplemented with applicable and available outside education to permit them to become proficient in performing the duties of the trade in which the individual is being trained.

D. Notice of openings for Upgrader Trainees shall be posted on the plant bulletin boards and Upgraders will be selected by the Company on the basis of their overall qualifications, which shall include but not be limited to applicable skills acquired in prior employment, skills acquired during Gulf + Western employment and applicable training and education acquired through recognized educational institutions. When qualifications are relatively equal, seniority will prevail.

E. Should no qualified employee apply for an Upgrader Trainee opening, the Company may hire a suitable qualified person from outside of the Company for training under provisions of ths agreement. New employees shall not be hired into these Upgrader Training classifications until an opportunity has been provided for all qualified employees having adaptable skill and ability to transfer into these classifications.

Article XVII Cont.

F.   Employees who are transferred into or
     hired into the Upgrader Training Program
     shall serve a probationary period of (90)
     days.  The probationary period shall not
     include periods of layoff and/or periods
     where an employee is transferred back
     into a non-skilled classification.

G.   Upon completion of the Upgrading period,
     such employee shall use for his/her skilled
     trades seniority (100%) of his/her actual
     training time for the purpose of layoff and
     recall.

H.   In the event of a curtailment of force in
     skilled trades classification and/or classi-
     fications, such Upgrader and/or Upgraders
     will be transferred out of the affected
     classification(s); i.e., Extrusion Die Repair,
     Sample Maker, Layout Inspector, back to
     their former department and classification
     in accordance with seniority provisions of
     this agreement, per Article IX, Section 5.
     An employee who occupies Upgrader Training
     status in one (1) of the three (3) skilled
     trade job classifications shall not be permitted
     to exercise his/her Upgrader Training
     seniority against an employee occupying
     Upgrader Training status in one (1) of the
     other two (2) skilled trade Upgrader job
     classifications.  The Upgraders will exercise
     seniority in their own Upgrading classification
     in the event of a reduction of force.  The
     last individual transferred into or hired into
     an Upgrader classification shall be the first
     to be transferred out or laid off, as the case
     may be; i.e., last in, first out.

Article XVII Cont.

I. An employee may withdraw from the Upgrader
Training Program at any time and return to
his/her former non-skilled classification
and department in accordance with his/her
non-skilled trade seniority. The Company
may remove an Upgrader Trainee during
his/her probationary period. The Company
may remove an Upgrader Trainee who has
completed the probationary period from the
program for failure to participate in the
educational program or for failure to
progress toward Journeyman status on
the job.

J. Employees who withdraw from the Upgrader
Training Program, or those employees who
are removed from the program per Paragraph
1 above, shall be prohibited from re-entering
an Upgrader Training Program in the same
classification, except by mutual agreement
of the Company and the Union.

K. An Upgrader will not be permitted to
exercise shift preference over another
Upgrader during the Upgrader Training
Program and/or Journeymen cannot exercise
shift preference over an Upgrader Trainee.
Upgraders shall work those shifts which
would be most advantageous to their
related training. Upon attainment of
Journeyman status, employees are subject
to shift transfer based on their skilled
trades seniority.

L.  The base rate of newly-hired Upgraders, excluding cost-of-living, shall be as follows:

| | |
|---|---|
| 1st Three Months | 70% of Journeyman Rate |
| 2nd Three Months | 75% of Journeyman Rate |
| 3rd Three Months | 80% of Journeyman Rate |
| 4th Three Months | 85% of Journeyman Rate |
| Next Six Months | 90% of Journeyman Rate |
| Next Six Months | 95% of Journeyman Rate |
| After Two Years | Journeyman Rate |

Seniority employees who transfer into the Upgrader Program shall enter the program at a base rate of (24¢) per hour less than the Journeyman rate; and, thereafter shall be increased six cents (6¢) per hour each six (6) months until the Journeyman rate is reached. However, employees transferring into the Upgrader Program whose hourly base rate in their former classification is less than (24¢) per hour below the journeyman rate shall retain their existing base rate until such time as the six-month interval of increases permits a rate adjustment. In no case will an employee, upon transfer into the Upgrader Program, maintain a base rate in excess of the journeyman rate for the Upgrader classification entered.

The Company will reimburse Upgrader Trainees for required tools not furnished by the Company in an amount not to exceed ($200) as follows:

A maximum of ($50) shall be provided by the Company at the outset of the training period. A maximum of an additional ($50) shall be provided by the Company after successful completion

Article XVII Cont.

of the probationary period. A maximum of an
additional ($100) shall be provided by the
Company after successful completion of the
training program. The Company shall be fur-
nished with receipts to verify expenditure of
the above monies for required tools.

M. The Upgrader Trainee(s) shall be required
to sign a statement consenting to the terms
and conditions of this agreement , thereby
waiving:

   1. The right to any permanent status in
   the skilled trades classification other
   than Upgrader seniority until success-
   ful completion of such training period.

N. It is desirable that Upgraders attain necessary
related training to make them competent in
as short a period of time as possible.

O. An Upgrader Trainee shall acquire journey-
man status only after two (2) calendar years
in the Upgrader classification and following
successful completion of all related class-
room instruction. Further, upon acquiring
journeyman status, overtime hours will be
equalized within their own classification.

P. The Company agrees to pay, on behalf of
those employees covered by this Upgrader
Program, for books, registration fees and/or
tuition required in connection with related
training for a period of not more than three
(3) years under this program. When an
Upgrader Trainee is required by the Company
to attend classes outside of the normal
working hours for the purpose of facilitating

Article XVII Cont.

training in Extrusion Die Repair, Sample
Maker or Layout Inspector, the Company
will pay the individual his or her applicable
rate of pay, including cost-of-living, but
exclu :ing shift premium and overtime
premium for the actual hours that an
individual participates in classroom instruc-
tion. This related training as outlined :
shall be on a mandatory basis for all future
employees entering into this Upgrader
Training. In the event an employee fails
to achieve a passing grade in a course of
related training, the cost of repeating such
course of instruction shall be borne by the
employee.

Q. The Upgrader Training Program may be
amended to include additional training
programs by mutual agreement of the
Company and the Union.

ARTICLE XVIII –
TERMINATION AND MODIFICATION

This agreement will become effective on Sept-
ember 3, 1982, and shall continue in full force
and effect without change until 12:00 midnight,
September 2, 1983, and thereafter for successive
period of (60) days, unless either party shall,
on or before the (60th) day prior to expiration,
serve written notice on the other party of a
desire to terminate, modify, alter, renegotiate,
change, or amend this agreement. A notice of
desire to modify, alter, amend, renegotiate, or
change, or any combination thereof, shall have
the effect of terminating the entire agreement
(on the expiration date) in the same manner as

108

## Article XVIII Cont.

a notice of desire to terminate, unless before
that date all subjects of amendments proposed
by either party have been disposed of by
agreement or by withdrawal by the party
proposing amendment.

Within (10) days after receipt of any such notice,
a conference will be arranged to negotiate the
proposals, in which case this agreement shall
continue in full force and effect until termina-
tion, as provided herein.

Notices shall be sufficient if sent by mail,
addressed, if to the Union, to Local No. 1402,
International Union, United Automobile, Aero-
space and Agricultural Implement Workers of
America, U.A.W., Holland, Michigan, or to
such other address as the Union shall furnish
to the Company in writing; and, if to the
Company, to Bohn Aluminum & Brass Division,
Plant 16, Gulf + Western Manufacturing Company,
Holland, Michigan, or to such other address as
the Company may furnish to the Union in
writing.

IN WITNESS WHEREOF, the Company has caused
these presents to be signed in its behalf by its
duly authorized and accredited representatives;
and the Union has caused the same to be signed
in its name by its duly authorized and accredited
representatives, and the Union has caused the
same to be signed in its name by its accredited
officers and committeemen this

_____ day of _____, 1982:

Article XVIII Cont.

Bohn Aluminum & Brass
Division--Plants 16 & 19
Gulf + Western Mfg. Co.
Holland, Michigan

International Union,
United Automobile,
Aerospace and Agri-
cultural Implement
Workers of America,
UAW & Local No. 1402,
UAW

_Richard A. Crane_
Richard A. Crane
Plant Mgr.-16

_Robert Rietveld_
Robert Rietveld

_Gilbert H. Hilt_
Gilbert H. Hilt
Plant Mgr.-19

_Donald G. Douglas_
Donald G. Douglas

_Michael M. Leitzell_
Michael M. Leitzell
Ind. Relations Mgr.

_Jerry Van Den Berg_
Jerry Van Den Berg

_Brian Hyma_
Brian Hyma

_Roger VanDam_
Roger VanDam
Plant Supt.-16

_Darlene Foster_
Darlene Foster

_Donald R. Hoyt_
Donald R. Hoyt
Plant Supt.-19

_John Blue_
John Blue

_Robert L. Hulsebus_
Robert L. Hulsebus
Intl Representative

_Joe C. Tucker_
Joe C. Tucker, Dir.-
Group Labor Relations

_Robert Fierman_
Robert Fierman
Regional Director

110

## JAIL LETTER

September 3, 1978

Mr. Robert Rietveld
Chairman, Bargaining Committee
Local #1402, U.A.W.
Holland, Michigan

During our 1978 contract negotiations, we dis-
cussed several times emergency leaves of
absence pertaining particularly to employees
who may be confined by the law. The following
expresses our understanding relative to such
a situation:

It is understood that if an employee is in-
carcerated by the law not to exceed 30
calendar days, he shall not lose his
seniority, but beyond this time he shall
be subject to loss of his seniority. In
addition, should an employee at any time
be convicted of a felony, he shall be
subject to loss of his seniority.

It is our belief that the above states the under-
standing between the two parties.

Sincerely,

J. C. Tucker
Director-Employee Relations
Bohn Group

cc:  Robert Hulsebus
International Representative
Region 1-D, U.A.W.

111

BOHN ALUMINUM & BRASS CORPORATION

PLANT #16, HOLLAND, MICHIGAN

March 28, 1974

SHOP RULES

THE FOLLOWING OFFENSES ARE VIOLATIONS
OF SHOP RULES AND ARE GROUNDS FOR
DISCIPLINARY ACTION, INCLUDING DISCHARGE.

1. Leaving job without permission or not reporting
   to the job on time.

2. Producing excessive scrap or inferior work
   through carelessness, or willfully wasting
   or damaging materials or supplies.

3. Theft or removal from the premises without
   proper authorization any company property
   or the property of any employee.

4. Sabotage (per Federal or State Law).

5. Conviction of a violation of the Espionage Act.

6. False statements on employment application
   or giving false information at the time of
   employment as to a pertinent item.

7. Immoral conduct or indecent behavior on
   company premises.

8. Fighting or attempting bodily injury to another
   on company premises (This does not include
   action taken in self-defense) or provoking a
   fight on company premises.

9. Deliberate falsification of production reports,
   time reports or other similar reports.

10. Intentionally and knowingly punching another
    employee's time card.

112

SHOP RULES Cont.

11. Misusing, destroying or damaging company property or property of any employee.

12. Making of false, vicious or malicious statements concerning any employee, the Union, the Company, or its products.

13. Using alcohol or narcotics on company premises, or reporting for work while obviously under the influence of alcohol or narcotics.

14. Interfering or refusing to cooperate with the Plant protection officers in the performance of their duties.

15. Sleeping on the job during working hours.

16. Insubordination – refusing or failing to obey an order from proper authority.

17. Mistakes due to carelessness.

18. Altering or defacing Company or Union notices on bulletin boards.

19. Distributing written or printed matter of any description on Company premises, unless approved by the Personnel Department; posting or removal of notices or signs, writing or marking on Company property, without authorization from the Company.

20. Creating or contributing to unsanitary conditions or poor housekeeping.

SHOP RULES Cont.

21. Engaging in horseplay, running, scuffling or throwing things.

22. Gambling or engaging in a lottery on Company premises.

23. Violating a safety rule or safety practice.

24. Failure to observe parking and traffic regulations on Company premises.

25. Failure to carry out a known and specified work procedure. Any instruction to deviate from such procedure must be in written form.

26. Disturbing or interfering with the harmonious relationship between the Company and the Union.

27. Use or possession of another employee's tools without the employee's consent.

28. Engaging in work of a personal nature on Company time and/or property.

29. Soliciting of any kind on Company premises at any time without authorization.

30. Entering the production area of Plant any time other than regular scheduled work shift.

THE ABOVE DOES NOT IMPLY THAT THERE ARE NO OTHER REASONS THAT THE COMPANY MAY DEEM CAUSE FOR DISCIPLINARY ACTION, INCLUDING DISCHARGE.

John J. Hosta
Plant Industrial Relations Mgr.

# INDEX

|  | Page |
|---|---|
| Absenteeism & Tardiness | 18 |
| Accidental Death & Dismemberment Insurance | 81 |
| Alternate Placement | 28 |
| Annual Inventory | 97 |
| Application of COLA to Earnings | 62 |
| | |
| Bereavement Pay | 64 |
| Bulletin Boards | 88 |
| Bumping | 29 |
| | |
| Call Back Pay | 50 |
| Changes of Address | 91 |
| COLA Amounts | 62 |
| Compensable Injuries | 91 |
| Complete Agreement | 89 |
| Contract Pre-emption | 89 |
| Cost-of-Living Allowance (COLA) | 60 |
| Credit Union Payroll Deduction | 91 |
| | |
| Daily Overtime | 43 |
| Dental Insurance | 86 |
| Disability Placement Option | 18 |
| Disciplinary Hearings | 17 |
| Disciplinary Protests | 18 |
| Discipline & Discharge, General | 17 |
| Discipline Penalty Limit | 17 |
| | |
| Educational Leaves | 42 |
| Extrusion Die Repair Training Program | 102 |
| | |
| Grievance Steps | 9 |
| Group Leaders | 92 |
| | |
| Holiday Celebration Dates | 68 |
| Holiday Pay Computation | 49,69 |
| Holidays & Eligibility | 69 |
| Home Department Recall | 23 |
| Hours of Work | 43 |
| Humanitarian Placement | 38 |

115

INDEX Cont.

Inspection Dept. Seniority Administration ..... 95
Insurance Changes ........................... 81
Insurance Coverage Dates..................... 86
Insurance, General .......................... 79

Job Posting ................................. 22
Job Transfer Requests ....................... 24
Journeyman Definition........................100
Jury Duty ................................... 66

Layoffs ..................................... 27
Layoff, Temporary............................ 34
Leaves of Absence ........................... 38
Life Insurance .............................. 79

Mailing Lists ............................... 90
Management Rights ...........................  5
Medical Insurance ........................... 85
Medical Leave ............................... 39
Memorandums of Understanding................. 92

New Pay Rate ................................ 59
Non-Discrimination ..........................  2
Non-Discrimination in Union Membership .......  3

Off-Shift Union Plant Entry ................. 15
Other Work during Leave ..................... 41
Overtime .................................... 43
Overtime Distribution ....................... 95
Overtime Equalization ....................... 45

Overtime, Notice of ......................... 44
Overtime, Pyramiding of ..................... 44
Overtime, Saturday .......................... 44
Overtime, Sunday & Holidays ................. 44
Overtime Work Opportunities ................. 44

INDEX Cont.

Page

Paychecks ........................... 50
Pay Rate, Production Standard and
    Health & Safety Grievances ............ 14
Peace Corps Leave .................... 42
Pension Plan Changes ................. 76
Pension Plan, General ................ 75
Permanent Work Force Increases ....... 21
Permanent Work Force Reductions ...... 27
Pregnancy Leave ...................... 41
Printing of Contract ................. 91
Probationary Period .................. 20
Production Standards ................. 5

Recalls Following Layoff .......... 34, 27
Report Pay ........................... 50
Representation Scope ................. 1
Retirees, Future ..................... 75
Retirees, Past ....................... 76
Rule Violation Penalties ............. 17

Safety ............................ 88, 96
Saw Shaprener-Canister Maker ......... 94
Seniority, Alternate Placement ....... 28
Seniority, Breakoff .................. 34
Seniority Continuation ............... 43
Seniority Coverage ................... 20
Seniority Definitions & Application .. 20
Seniority, Departmental .............. 20
Seniority Lists & Union Officer Lists  36
Seniority Outside of Skilled Trades .. 99
Seniority, Preferential .............. 32
Seniority upon Transfer .............. 29
Shift Designation .................... 49
Shift Preference ..................... 37
Shift Premium ........................ 51
Skilled Trades, Apprenticeship Standards .. 102

INDEX Cont.

Page

Skilled Trades, Definition ..................... 98
Skilled Trades Employment..................... 99
Skilled Trades, Labor Agreement
      Application ......................102
Skilled Trades, Layoff & Recall ..............101
Skilled Trades, Occupational Seniority ....... 98
Skilled Trades Occupations ...................101
Sub-Contracting .............................. 5
Supervisors Seniority Bargaining
      Unit Work ............................... 33

Termination & Modification ...................108
Temporary Transfers .......................... 31
Transfers .................................... 24
Transition & Bridge Benefits ................. 81
Trustee Reports .............................. 90

Union Accommodations ......................... 96
Union & Political Leaves ..................... 41
Union Bargaining Committee ................... 6
Union Membership Cessation ................... 4
Union Representation on Overtime ............. 47
Union Shop ................................... 2
Union Stewards ............................... 6
Union Time Away from Plant ................... 48
Union Time in Contract Negotiations .......... 48
Union Time, Permission for ................... 14
Unions, Other ................................ 2

Vacation Pay ................................. 74
Vacation Time Off ............................ 72
Validity of Agreement ........................ 89
Vending Machine Proceeds ..................... 97

Wage Administration .......................... 56
Wages ........................................ 51
Weekly Sickness & Accident Benefits ......... 83
Workmen's Comp. Offset to Pension Benefits... 77

118